# 25-222-cr(L),
# 25-223-cr(CON), 25-224-cr(CON)

## United States Court of Appeals
### for the
## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ALON ALEXANDER, OREN ALEXANDER, TAL ALEXANDER,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF FOR DEFENDANTS-APPELLANTS
## ALON ALEXANDER AND OREN ALEXANDER

RICHARD C. KLUGH
LAW OFFICE OF RICHARD C. KLUGH
*Attorney for Defendant-Appellant*
  *Oren Alexander*
40 NW 3rd Street, PH1
Miami, Florida 33128
(305) 903-6900

HOWARD M. SREBNICK
JACKIE PERCZEK
ALEXA KLEIN
JEANELLE GOMEZ
BLACK SREBNICK
*Attorneys for Defendant-Appellant*
  *Alon Alexander*
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
(305) 371-6421

CP COUNSEL PRESS    (800) 4-APPEAL • (380462)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

STATEMENT OF JURISDICTION ................................................................ 4

STATEMENT OF THE ISSUE PRESENTED ................................................ 4

STATEMENT OF THE CASE ........................................................................ 4

A.     The Detention Litigation in the Southern District of Florida ......................... 5

     i.     Proceedings for Tal Alexander before Magistrate Judge Reid ............ 5

     ii.    Proceedings for Alon Alexander Before Magistrate Judge
          Sanchez ...................................................................................... 13

B.     Alon and Oren Alexander Pass Polygraph Examinations ........................... 20

C.     The Detention Hearing in the Southern District of New York ..................... 21

D.     The Court Denied the Alexanders' Motion for Bail ..................................... 29

     i.     Danger to the Community ................................................................ 30

     ii.    Risk of Flight .................................................................................. 31

SUMMARY OF THE ARGUMENT ............................................................. 32

STANDARD OF REVIEW ........................................................................... 33

ARGUMENT ................................................................................................. 35

I.     The District Court Misapplied The Bail Reform Act When It
     Rejected Out Of Hand Statutorily Authorized Conditions Of
     Release, Including The Retention Of A Private Security Firm To
     Serve As A Custodian, That Would Reasonably Assure The
     Defendants' Appearance In Court And The Safety Of The
     Community ................................................................................................... 35

     A.     The Supervision of a Defendant by a Third-Party Custodian
          Has Been a Proper Condition of Pretrial Release Since the
          Founding .......................................................................................... 40

i

B.    The Current System of Pretrial Release Considers the Defendant's Wealth When Setting Conditions, Including Bail ..........46

C.    The District Court Denied Release Based on a Premise that is Fundamentally at Odds with the Excessive Bail Provision of the Eighth Amendment........................................................................55

II.    The District Court Misapplied *Boustani* To Reject Out Of Hand The Private Security Measures Proposed By The Alexander Brothers Where The Brothers Were Detained Primarily Because Of Their Wealth ........................................................................................59

III.    The District Court Erred By Detaining The Alexander Brothers As Posing A Future Danger To The Community, And In Any Event The Security Measures Proposed By The Alexanders Alleviate Any Perceived Danger ........................................................................75

A.    The Years-Old Historical Allegations the Court Relied Upon Do Not Establish Future Danger ........................................................78

B.    The District Court Overstated the Strength of the Government's Case ........................................................83

i.    The factual basis for the charges is weak ................................83

ii.    The legal basis for the charges is insufficient...........................88

CONCLUSION ........................................................91

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Blair v. Inside Ed., Prods.*,
   7 F. Supp. 3d 348 (S.D.N.Y. 2014) ....................................................77

*Devine v. State*,
   37 Tenn. 623 (1858)...........................................................................42

*Luis v. United States*,
   578 U.S. 5 (2016)...............................................................................52

*Neal v. Spencer*,
   88 Eng. Rep. 1305 (K.B. 1698) .........................................................55

*ODonnell v. Harris Cnty., Texas*,
   251 F. Supp. 3d 1052 (S.D. Tex. 2017), *aff'd as modified*,
   882 F.3d 528 (5th Cir. 2018), and *aff'd as modified sub nom*.
   *ODonnell v. Harris Cnty*., 892 F.3d 147 (5th Cir. 2018) ...................55

*Rex v. Bowes*,
   99 Eng. Rep. 1327 (K.B. 1787) .........................................................55

*Ross v. Moffitt*,
   417 U.S. 600 (1974)...........................................................................52

*Smith v. Bennett*,
   365 U.S. 708 (1961)...........................................................................39

*Stack v. Boyle*,
   342 U.S. 1 (1951)...............................................................................56

*Taylor v. Taintor*,
   83 U.S. 366 (1872).............................................................................42

*Truong Dinh Hung v. United States,*
   439 U.S. 1326 (1978)...................................................................67, 68

*United States v. Aiston*,
   420 F.2d 176 (D.C. Cir. 1969)...........................................................72

*United States v. Bajakajian*,
   524 U.S. 321 (1998)...........................................................................56

*United States v. Berrios-Berrios,*
  791 F.2d 246 (2d Cir. 1986) .................................................................72

*United States v. Bodmer,*
  2004 WL 169790 ...................................................................68, 71

*United States v. Boustani,*
  932 F.3d 79 (2d Cir. 2019) .......................................................*passim*

*United States v. Boustani,*
  2019 WL 3231097 (2d Cir. May 16, 2019) ........................................37

*United States v. Brooks,*
  872 F.3d 78 (2nd Cir. 2017) .................................................................55

*United States v. Chimurenga,*
  760 F.2d 400 (2d Cir. 1985) .................................................................77

*United States v. Clark,*
  96 U.S. 37 (1877)..................................................................................78

*United States v. Dreier,*
  596 F. Supp. 2d 831 (S.D.N.Y. 2009) ...................................36, 54, 63

*United States v. English,*
  629 F.3d 311 (2d Cir. 2011) ...........................................................35, 77

*United States v. Esposito,*
  749 F. App'x 20 (2d Cir. 2018) ...........................................2, 37, 63

*United States v. Ferranti,*
  66 F.3d 540 (2d Cir. 1995) .................................................................35

*United States v. Fox,*
  602 F. Supp. 3d 434 (W.D.N.Y. 2022), *aff'd*
  No. 22-1043, 2022 WL 2564600 (2d Cir. July 8, 2022)..............*passim*

*United States v. Friedman,*
  837 F.2d 48 (2d Cir. 1988) .................................................................72

*United States v. Hansen,*
  108 F. App'x 331 (6th Cir. 2004) ......................................................68

*United States v. Jin Fuey Moy,*
  241 U.S. 394 (1916).............................................................................58

iv

*United States v. Johnson*,
  446 F.3d 272 (2d Cir. 2006) ...................................................................88

*United States v. Karni*,
  298 F. Supp. 2d 129 (D.D.C. 2004) ........................................................69

*United States v. Khashoggi*,
  717 F. Supp. 1048 (S.D.N.Y. 1989) ........................................................68

*United States v. Kresler*,
  392 F. App'x 765 (11th Cir. 2010) ..........................................................65

*United States v. Kwong*,
  69 F.3d 663 (2d Cir. 1995) ......................................................................88

*United States v. Madoff*,
  586 F. Supp. 2d 240 (S.D.N.Y. 2009) ...........................................36, 71, 72, 77

*United States v. Mattis*,
  963 F.3d 285 (2d Cir. 2020) ..............................................................34, 35

*United States v. Mercado*,
  No. 24-MJ-609-MJP, 2024 WL 4647613 (W.D.N.Y. Nov. 1, 2024).......77, 80, 81

*United States v. Mercado*,
  No. 24-MJ-561-MJP, 2024 WL 3082704 (W.D.N.Y. June 20, 2024) ................77

*United States v. Mercedes*,
  254 F.3d 433 (2d Cir. 2001) ..............................................................34, 35

*United States v. Motamedi*,
  767 F.2d 1403 (9th Cir. 1985) .................................................................69

*United States v. Raniere*,
  55 F.4th 354 (2d Cir. 2022) .....................................................................89

*United States v. Sabhnani,*
  493 F.3d 63 (2d Cir. 2007) .........................................................37, 38, 73, 74

*United States v. Salerno*,
  481 U.S. 739 (1987)...........................................................................57, 76

*United States v. Samet*,
  11 F. App'x 21 (2d Cir. 2001) .................................................................65

*United States v. Schlegel,*
  2008 WL 11338900 (E.D.N.Y. June 13, 2008)........................................37

*United States v. Shakur*,
 817 F.2d 189 (2d Cir. 1987) ...................................................35

*United States v. Traitz*,
 807 F.2d 322 (3d Cir. 1986) ...................................................76

*United States v. Walls*,
 784 F.3d 543 (9th Cir. 2015) ..................................................90

*United States v. Weigand*,
 492 F. Supp. 3d 317 (S.D.N.Y. 2020) .............................54, 61, 62, 63

*United States v. Zhang*,
 55 F. 4th 141 (2d Cir. 2022) ...................................................83

## Statutes and Other Authorities:

U.S. Const, Amend. I ..............................................................52

U.S. Const, Amend. VI .............................................................52

U.S. Const, Amend. VIII ....................................................*passim*

18 U.S.C. § 1591 ............................................................*passim*

18 U.S.C. § 1591(e)(3) ............................................................89

18 U.S.C. § 1594 ........................................................84, 88, 90

18 U.S.C. § 3141 ...................................................................2

18 U.S.C. § 3142 .......................................................3, 44, 45, 48

18 U.S.C. § 3142(b)(2) .............................................................49

18 U.S.C. § 3142(c) ...............................................................46

18 U.S.C. § 3142(c)(1)(B) ......................................................33, 34

18 U.S.C. § 3142(c)(1)(B)(i) ...............................................*passim*

18 U.S.C. § 3142(c)(1)(B)(xi) ......................................................46

18 U.S.C. § 3142(c)(1)(B)(xii) .....................................................46

18 U.S.C. § 3142(e) ...............................................................63

18 U.S.C. § 3142(e)(1) .........................................................33, 72

18 U.S.C. § 3142(e)(3)(D) ......................................................34, 76

18 U.S.C. § 3145(c) ...................................................................................4

18 U.S.C. § 3146 .....................................................................................43

18 U.S.C. § 3146(a)(1) .......................................................................42, 43

18 U.S.C. § 3282(a) ................................................................................84

18 U.S.C. § 3299 .....................................................................................84

22 U.S.C. § 7101(2) ................................................................................90

22 U.S.C. § 7101(8) ................................................................................90

28 U.S.C. § 1291 .......................................................................................4

31 U.S.C. § 9304 .....................................................................................46

31 U.S.C. § 9305 .....................................................................................46

2 Frederick William Polluck & Frederic William Maitland, *The History of
English Law Before the Time of Edward I* 514 (2d. ed. 1984 [1898]) ................56

Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail:
Historical Perspectives*, 82 Colum. L. Rev. 328 (1982) ......................................41

Fed. R. Crim. P. 46(e) .............................................................................46

Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 Harv. L.
Rev. 1816 (2024) ...............................................................................40, 41

Pattern Crim. Jury Instr. 11th Cir. BI B5 (2024) ....................................86

Rakoff, J., *Why Innocent People Plead Guilty*, The New York Book
Review (Nov. 20, 2014) .......................................................................53

S. Rep. No. 98-225, 1984 U.S.C.C.A.N., 1983 WL 25404 (Leg. Hist.)
(Aug. 4, 1983)...................................................................................*passim*

vii

**INTRODUCTION**

For decades courts have imposed home confinement and electronic monitoring as conditions of pretrial release under the Bail Reform Act. The Alexander brothers—appellants Tal, Alon, and Oren Alexander—proposed release under these and other robust conditions, offering that they and their parents would sign as sureties on a bond in any amount, pledging the entirety of the Alexander family's substantial life savings as security on the bond. The brothers and their parents also agreed that if any one of the brothers violated the conditions of release, all the brothers would be remanded to custody and the bond would be forfeited, leaving the brothers, their spouses and children, and the Alexander parents destitute.

In separate detention hearings in Florida and then New York, the courts below expressed concern, based on the government's extensive arguments about the risk of flight posed by the Alexanders' wealth, that the brothers' access to significant financial resources would allow them to flee and establish their lives in a foreign nation. Under similar circumstances involving wealthy defendants, multiple district courts in New York had imposed private security as a condition of release, and twice this Court affirmed. Therefore, the Alexander brothers proposed to supplement their home detention with the additional condition of a third-party custodian consisting of a private security firm that was known to the District Court (Hon. Valerie Caproni) and that would provide 24/7 supervision of the Alexander brothers and serve as

1

further assurance of community safety and their appearance in court. The District Court categorically rejected the Alexanders' proposal without considering it, stating that under *United States v. Boustani*, 932 F. 3d 79 (2d Cir. 2019), the Bail Reform Act prohibits a wealthy defendant from obtaining release to the custody of a private security firm because a defendant of lesser means cannot afford the same condition.

But the Bail Reform Act (18 U.S.C. § 3141 *et seq.*) does not contain such a prohibition. To the contrary, the Act expressly authorizes a defendant's pretrial release from government custody "to remain in the custody of a designated person, who agrees to assume supervision" and "is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3142(c)(1)(B)(i). The conditions of release proposed by the Alexanders were permissible under the Bail Reform Act and under *Boustani*, especially because the government and the court relied on the Alexanders' substantial wealth to detain them. *See Boustani*, 932 F. 3d at 82 ("private-security condition . . . may be appropriate where the defendant is deemed to be a flight risk primarily because of his wealth. In other words, a defendant may be released on such a condition only where, but for his wealth, he would not have been detained"); *United States v. Esposito,* 749 F. App'x 20, 24 (2d Cir. 2018) (district courts are not precluded from imposing private security as a condition of

2

release "when the defendant has substantial resources and such wealth contributes to his risk of flight").

No one can rationally dispute that because of the Alexanders' considerable wealth, they have proposed conditions of release, including private security, that can guarantee the community's safety and their appearance in court. This satisfies all the statutory conditions mandating release under the Bail Reform Act and 18 U.S.C. § 3142, as there is nothing in the Act that precludes release when the legislatively-enacted criteria are met. And there is nothing in the Act that adds the disqualifier, imposed by the District Court based on *Boustani*, that if the Alexander brothers use their wealth to satisfy the statutory criteria, the brothers are not entitled to their statutory right to be released. Overlaying this statutory right to pretrial release once the express statutory criteria are met is the Eighth Amendment and its constitutional history.

This appeal thus presents in stark and unambiguous terms the following statutory and constitutional issue: If the express statutory criteria for pretrial release are satisfied by the Alexander brothers using their wealth, may a court nevertheless deny the statutory and constitutional right to release on the ground that other, less wealthy, defendants could not afford to satisfy the criteria? The answer is No. Otherwise, if this were the rule, all monetary bail would have to be abolished as

3

specifically contemplated by the Eighth Amendment because not all defendants are equally able to post bond.

To the extent that this Court holds otherwise, we preserve this important statutory and constitutional issue for *en banc* and Supreme Court review.

## STATEMENT OF JURISDICTION

Alon and Oren Alexander appeal from a final oral order of the District Court denying them pretrial release under the Bail Reform Act. A-516-520.[1] The order was entered on January 16, 2025. *Id.* Each appellant filed a timely notice of appeal on January 28, 2025. A-152-156. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3145(c).

## STATEMENT OF THE ISSUE PRESENTED

Whether the District Court erred by refusing to consider pretrial release to a third-party custodian consisting of a security firm that would reasonably assure the Alexanders' appearance in court and the safety of the community on the basis that such release would be unfair to poor pretrial detainees.

## STATEMENT OF THE CASE

Tal, Alon, and Oren Alexander (the Alexander brothers) are charged in a three-count Superseding Indictment with sex trafficking offenses under 18 U.S.C. § 1591.

---

[1] Citations to A-__ are to the Appendix filed by Appellant Tal Alexander in the related case, No. 25-224, docket entries 17.2 and 17.3.

4

A-1. Count I alleges that the Alexander brothers conspired to commit sex trafficking from 2010 until 2021 by paying for travel, luxury accommodations, and experiences so that women would travel with them or meet them at events or parties and then used drugs or force to sexually assault them. A-2-3. Count II charges Tal with sex trafficking Victim 1 almost 14 years ago, in July 2011; Count III charges all three brothers with sex trafficking Victim 2 more than eight years ago, in September 2016.

The Alexanders were arrested on December 11, 2024, in Miami Beach, Florida. The government sought their detention based on danger and risk of flight.

### A. The Detention Litigation in the Southern District of Florida

*i.    Proceedings for Tal Alexander before Magistrate Judge Reid*

On December 13, 2024, Tal appeared for a detention hearing before Magistrate Judge Lisette M. Reid. At the conclusion of the hearing, Magistrate Judge Reid held that release conditions could be fashioned to ensure the safety of the community, but that Tal posed a serious risk of flight that required detention. Magistrate Judge Reid found that the Alexander brothers and their parents have "extensive resources" of about "115 million dollars" so "[Tal] clearly has the financial resources to flee if he chose to do so" and "home confinement and GPS monitoring" are not "foolproof":

> With respect to danger to the community, I will find that there are conditions and some combination of conditions that could alleviate the danger to the community. So that is not my area of concern.

5

My area of concern is risk of flight…[T]he weight of the evidence is quite strong as I see the affidavit from the agent and the evidence that have been presented to me.

The nature and the circumstances of the offense are quite serious. This family has, however, extensive resources that I am not, at this point, aware of exactly where the 115 million dollars is substantial for them as it is for some.

He clearly has the financial resources to flee if he chose to do so. And in fact, home confinement and GPS monitoring has proven in the past to not be foolproof. So that does not reasonably assure the Court in this case that he will appear for his hearings as required.

A-229-230.

The Magistrate Judge's findings credited the government's argument at the detention hearing that Tal posed a risk of flight because he is a multimillionaire with the resources to charter a private jet or yacht and flee:

BY AUSA ASTIGARRAGA: . . . The defendant is a multimillionaire who has the resources to flee and live comfortably in hiding. The Defendant and his family have access to significant wealth. He and one of his brothers owns a luxury real estate brokerage with a real estate portfolio valued at hundreds of millions of dollars. They are known in the real estate world for selling high-end luxury homes to celebrities and the ultra rich. The Defendant has properties here in Miami as well as over in New York.

The Defendant and his family also have significant foreign ties. Particularly to Israel and to Brazil. Their parents are from Israel and the Alexander brothers frequently travel to Israel to visit family, conduct business, and for vacation. They also travel frequently outside the United States to other locations often booking flights at the last minute and traveling by their private jet or on a yacht.

6

We have confirmed with OIA, who indicated that despite an extradition treaty, we cannot ensure the Defendant's extradition back to the U.S. should he flee out to Israel.

A-172-173.

The government did not call any witnesses at the hearing and proceeded by proffer instead. The government asserted that its case against the Alexanders was strong based on documents, text messages, videos, and the testimony of 40 complainants. A-163-173. According to the government, text messages between the brothers include discussions about drugs and sex with women at parties, and the government claimed that videos show one or more of the brothers having sex with women who are under the influence of alcohol or drugs. *Id.*

As to Count II, the government proffered that in 2011, Victim 1 traveled to the Hamptons with her friend and attended a party with Tal. The government proffered that Victim 1 drank half a glass of wine and then her memory "became hazy," but she had "several distinct memories" including "being held down by [Tal] while another man entered the room," "being in a second location with [Tal] and another man and that a camcorder was set up," and the next day woke up "with a physical sensation indicating recent vaginal penetration." A-167.

As to Count III, the government proffered that in August 2016, the Alexanders paid for Victim 2 and her friend to travel to the Hamptons. A-168. The government proffered that the Alexanders hosted a party where Oren gave Victim 2 a cocktail

7

that made her feel strange and she struggled to walk. The government proffered that Alon assisted Victim 2 to a bedroom to lie down. According to the government, Oren entered the room later and sexually assaulted Victim 2 while she was impaired. A-169.

The government claimed that before indictment, Tal engaged in "obstructive conduct" in two ways. A-171-172. First, by filing a police report for harassment against a woman who claimed that Tal had digitally penetrated her. A-171. Second, by telling another woman that he would sue her for defamation for claiming that Tal and Oren had sexually assaulted her. *Id*. The government also argued that in March 2024, after civil lawsuits alleging sex assault were filed against the Alexander brothers, Alon "began compiling files" about the complainants, and the government speculated that this was "part of an apparent attempt to discredit their accusers." A-172. In a subsequent hearing, Alon's counsel explained to the Court that the files were created for the Alexanders' civil lawyers to defend the assault allegations and requested that the government desist from continuing to review the files, stating on the record that the contents of the files are attorney-client privileged. A-285-286.

Following the government's proffer, the FBI case agent was made available for cross-examination. When asked, "where is it that [Tal] has strong ties to another nation in the world?" the agent responded, "your client travels to Israel." A-186-187. The agent acknowledged that the Alexanders are Jewish and that many Jewish people visit

Israel. A-187-188. The agent testified that in July 2024, the Wall Street Journal revealed that the Alexander brothers were under criminal investigation. A-182. When asked if the FBI had any evidence that Tal had made any plans or efforts to leave the United States after the article was published, the agent responded, "I do not, but your client has access to boats which he can leave at any time." A-185. The government repeated this in its argument to the Magistrate Judge, emphasizing that the Alexanders are not like the "usual" people who book travel on Priceline but rather have "the kind of wealth that they can just decide any given day, in a matter of hours, we are headed off to this international location," and jump on a yacht or private plane:

> Turning next to the Defendant's significant wealth, this is a person with access to millions of dollars, private jets and yachts. You heard from the agent that when he travels it is at a moment's notice. It is actually why he is sitting here in the Southern District of Florida today because it was not a planned trip. It is not a usual thing where he goes on to Price Line and decides where he is going to go. He has the kind of wealth that they can just decide any given day, in a matter of hours, we are headed off to this international location. When they go to the Bahamas we are going there by a yacht. And there is not the same kind of manifest regulation that you heard from the agent as there would be on a particular commercial flight.

> Additionally, Your Honor, the Defendant does have significant international ties. The fact that his parents are Israeli, the fact that he has traveled back to Israel, the fact that we have conferred with OIA and they have indicated that if he does flee there, which has happened in the past, that they are not going to be able to extradite him back and that is not a sure thing. The fact that we are potentially not going to be able to extradite him surely is another cause for concern and demonstrates that he is a risk of flight.

A-208-209.

Tal offered a substantial bail package and argued that he had known for almost five months (since the Wall Street Journal article) that he was under criminal investigation and did not travel internationally, much less charter a yacht or jet to leave quickly for Israel. A-212. Tal argued that the risk of flight to Israel was wrongly premised on the fact that Tal and his family are wealthy and of Israeli descent; that he was born in the United States and has significant ties to South Florida, is married with a newborn baby, and that there had been no allegations that he engaged in any wrongdoing after 2021, the ending date for the conspiracy alleged in the indictment. A-213-214.

Tal offered a $115 million bond, secured by the equity in his parents' home, an office building, his own home, and the homes of his brothers Oren and Alon. Tal agreed to surrender his U.S. (and only) passport and to home confinement and GPS tracking. A-216-217. Many friends and family were present to sign as sureties on Tal's bond. A-218. And Tal offered that he, his wife, and their newborn child would move in with Tal's parents pending trial. A-216.

The government opposed release, suggesting that because Tal used his wealth to commit the crimes charged in the indictment, he should be precluded from using his wealth to post bond:

> Additionally, as it relates to a risk of flight, Judge, I understand that this is an enormous number. I think the fact that the Defendant usually uses his wealth to commit these crimes. And he is now using it here to say, look at this, 115 million dollar bail package, let me out. Is another

example of the Defendant in terms of using his wealth something that he is a very small subset of people who has access to and he is trying to get bail at this point.

A-222-223. The government also argued that Tal used his "multimillion dollar bank account" and the "six lawyers that are here in the courtroom" to "assert power and control" by telling a woman who accused him of assault that he would sue her for defamation. A-224-225.

Finally, the government argued that if placed on house arrest, Tal posed a danger of raping any female staff working in the home and of using his cell phone to lure women to the home he shares with his wife and newborn baby and rape them, arguments the Magistrate Judge struggled to understand:

> THE COURT: So you are suggesting that there are women who would, knowing how public this is right now, still go to his home? I am concerned. I want to make sure I understand your argument.

> MS. ASTIGARRAGA: Yes, Your Honor. To the extent that there is any kind of people who are staffed by the Defendant's home. To the extent that there are women there. To the extent he has access to cell phones being able to lure the same kinds of victims that he did in this case repeatedly over and over for eleven years, Your Honor.

A-221-222. At the conclusion of the hearing, Magistrate Judge Reid detained Tal on risk of flight only. A-229-230. In a written order, Magistrate Judge Reid reiterated that "Defendant is a successful real estate agent in the luxury market and lives a lifestyle supported by extensive financial resources . . . When considering the nature

and circumstances of the offense and the Defendant's extensive financial resources, the Court agrees with the government that the Defendant is a flight risk." A-23-24.

On December 16, 2024, Tal filed a motion to reopen the detention hearing to address Magistrate Judge Reid's stated concern that although Tal and his family offered a $115 million bond secured by all the real estate his immediate family owns, Tal might still flee because his family may have additional assets. *United States v. Tal Alexander*, 24-mj-04544 (S.D. Fla.), ECF#22. Tal proposed to call witnesses and produce financial statements under seal, so that the Court could be confident that there was potent financial disincentive to flee. *Id.* at 9. Tal also proposed to offer an increased bail package and additional conditions to mitigate any remaining concerns the court had regarding flight, including a bond in any amount to be signed by Tal's parents and secured by the entirety of their life savings. *Id.* at 6. Tal offered to provide a comprehensive family financial statement and proposed "the most stringent conditions of release," including 24/7 monitoring by private security. *Id.* And Tal asked for the opportunity to refute the government's representation that Tal would not be extraditable should he flee to Israel, which was unequivocally incorrect. *Id.*

On December 19, 2024, Tal filed a supplemental brief, proposing to retain a private security service with extensive experience performing bail security and pretrial release services to provide a full-time armed security detail at the location of Tal's home detention. *Id.* at ECF#28. The security company would install added

security measures at the home, including video cameras and door and window sensors and alarms, and would ensure that 24/7, Tal would be supervised by armed security professionals. *Id*. at 2.

Magistrate Judge Reid denied the motion to reopen without addressing the private security proposed by Tal and issued a warrant for Tal's removal to New York. *Id.* at ECF#32. Tal appealed the detention order to United States District Judge Caproni (SDNY); those proceedings are addressed below.

### ii. *Proceedings for Alon Alexander Before Magistrate Judge Sanchez*

On December 29, 2024, Alon Alexander filed a Motion for Bond in the Southern District of Florida, offering similar conditions as those offered in Tal's motion to reopen. *United States v. Alon Alexander*, 24-mj-04616 (S.D. Fla.), ECF#8. At Alon's detention hearing, the government proceeded by proffer and this time made FBI Special Agent Audra Hampsch available for cross-examination. A-256.

Special Agent Hampsch testified that she was not a witness at the grand jury, had not reviewed the testimony that was presented to the grand jury, and did not know whether anyone who accused Alon or any of the brothers testified before the grand jury. A-256, A-278. Agent Hampsch never interviewed Victim 2, did not investigate the contact that Victim 2 had with the Alexander brothers after the weekend in the Hamptons when the sexual assault allegedly occurred, A-264, did not know if Victim 2 admitted to consensual sexual activity with any of the

13

Alexander brothers, A-265, and admitted that after the alleged sexual assault took place, Victim 2 remained at the Hamptons house and went on boat rides with the Alexander brothers. A-269-270. Agent Hampsch was not aware of any allegation against Alon involving conduct after 2016. A-280. And the 2016 allegation that forms the basis for Count III in the indictment does not allege that Alon engaged in any sexual conduct with Victim 2.

Agent Hampsch could not identify any toxicology evidence regarding Victim 2's claims, A-275, did not know if anyone corroborated Victim 2's claims, A-277, and could not identify which Alexander brother (Alon and Oren are twins) was depicted in a photograph taken during the weekend in the Hamptons when the sexual assault allegedly occurred. A-271. Finally, Agent Hampsch could not point to any physical evidence corroborating the allegations in the Superseding Indictment, A-274-275, or any evidence that the Alexander brothers ever possessed drugs. A-276.

Alon offered the testimony of his mother, Orly; his wife, Shani; his family friend and ex-girlfriend, Danielle Epstein; his uncle, Gil Neuman; and V2 Global leader and former Police Chief Don De Lucca.

Alon's mother Orly testified that she moved to the United States from Israel at the age of 17 with her husband, Shlomy. A-289. Orly and Shlomy attended Miami-Dade Community College and then transferred to the University of Miami, where Orly obtained a degree in science and computer science. A-290. During college, Orly

14

was a Hebrew teacher and later a Hebrew school principal. *Id*. Orly and Shlomy started Kent Security in 1982, which provides security services nationwide. *Id*.

Orly and Shlomy have been married for 49 years. A-291. They both became United States citizens in 1983, although Orly maintains her Israeli passport. *Id*. The Alexander brothers were born in Miami Beach. A-292. Orly testified that she worked with defense counsel to present the Court with a schedule of her and Shlomy's assets, and that schedule was later submitted under seal. A-293-294. Orly testified that she understood that if she signed a personal surety bond in any amount set by the judge, and any of her sons failed to appear, Orly and Shlomy would lose everything up to the amount of the bond, so that if the judge set a bond of a billion dollars, and any of her sons failed to appear, Orly and her husband would be left destitute. *Id*.

The defense proffered the testimony of Shani Alexander, Alon's wife. A-298. Shani was born in Israel, graduated high school in Israel, and served in the Israeli army. *Id*. Based on her performance on aptitude tests administered in the Israeli army, Shani was chosen to serve as an assistant to a brigadier general and given a high security clearance. A-299. Shani and Alon met in Israel, and they married in 2020. A-299, A-302. Shani has never seen her husband Alon use drugs or provide drugs to any woman. A-300. She has never seen her husband, or either of his brothers, forcing anyone to do anything, and she has never witnessed any woman screaming for help or accusing Alon or his brothers of sexual assault. *Id*.

Next, Danielle Epstein testified as a character witness. A-306. Danielle met Alon in college and has known Alon and his family for 20 years. *Id*. She had a romantic relationship with Alon for three years after college, between 2008 and 2011, and they remained friends. A-307-308. Danielle lived with Alon while they were dating and never witnessed "anything even remotely close" to the allegations made in this case. *Id*. Danielle also testified that Alon is "a very honest man, a kind person, and hard working." A-309.

Gil Neuman, Alon's uncle, offered to sign a personal surety bond on behalf of Alon and his brothers. A-311. Also, because the government had argued that placing the Alexander brothers under house arrest at their parents' waterfront home would facilitate their escape by boat, Gil offered his non-waterfront home to be used instead. *Id*.

Next, Don De Lucca of V2 Global testified. A-312. De Lucca is a retired police chief from Miami-Dade County who, together with Jim Milford (former DEA deputy administrator) and DC Page (former Customs and Border Patrol agent), leads V2 Global, a security company. A-313. Former chief De Lucca supervised the defendant in the Eastern District of New York in *United States v. Napout*, No. 15-cr-00252 (E.D.N.Y.). *Napout* was a FIFA corruption case where the government *agreed* that the defendant, a foreign national with Italian and Paraguayan passports, could

16

be released to house arrest on a $20 million secured bond and private security conditions as follows:

> A private security service, approved by the U.S. Attorney's Office and the FBI, will monitor the defendant's physical location and provide security 24 hours per day, 7 days per week. The private security service shall accompany the defendant during all transit to and from his residence…The defendant is subject to video surveillance, 24 hours a day, 7 days per week, at the doors of his residence and other points of entrance. The costs…shall be borne solely by Defendant.

*Id.*, ECF#127:2.

Finally, defense counsel proffered a letter from several neighbors who appeared on Alon's behalf, describing Alon as a good neighbor who takes care of his community and helps organize the neighborhood to ensure it is a safe and good place to live in Miami Beach. A-315.

The government opposed release, reiterating the position it had taken at Tal's detention hearing that the Alexanders must be detained because of their massive wealth:

> [C]ounsel made clear in their presentation that money is no object. Set a bond in any amount. Whatever amount the Court chooses. That makes clear the depth of the resources that these Defendants have if they are prepared to flee. If money is truly no object for a bond, money is no object to secure your freedom to avoid spending 15 years at minimum in jail.

A-325. And the government again argued that the Alexanders pose a risk of flight because they are multimillionaires with the means to flee: "[BY AUSA]: I will now turn to risk of flight. Your Honor, the Defendants are multimillionaires who have

access to resources to flee and live comfortably outside of the United States…." A-251.

Magistrate Judge Sanchez continued the detention hearing to allow Alon to present additional information regarding the proposed home confinement conditions. A-359. The government submitted a supplemental memorandum arguing that the Alexander brothers were trying to "buy their way out of federal detention by funding their own private jails" and that this is prohibited under *United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019). 24-mj-04616 (S.D. Fla.), ECF#16:2. Alon filed a comprehensive outline of V2 Global's plan for monitoring the Alexanders' home confinement and asserted that this mitigation is permitted under *Boustani* where a defendant is deemed a flight risk primarily because of his wealth. *Id.* at ECF#17:2-4; *Boustani,* 932 F.3d at 82 ("the private-security condition we described in *Sabhnani* may be appropriate where the defendant is deemed to be a flight risk primarily *because of* his wealth. In other words, a defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained").

At the continuation of the detention hearing, Alon re-submitted the schedule of the Alexander family's assets that was previously submitted under seal, and a PowerPoint presentation (under seal) highlighting the unreliability of certain accusers whose identities were known. A-58-59, A-524, A-529. With respect to

pretrial release, Alon offered the following bail package, described in detail in his memorandum (ECF#17):

> (i) a multi-million-dollar bond in any amount, secured by all of the assets of the Alexander brothers and their parents, effectively the entire Alexander family fortune;
>
> (ii) surrender of his U.S. passport, and the passports of his wife, children, and parents;
>
> (iii) GPS monitoring and home confinement in an eighth-floor, non-waterfront condominium in Miami; and
>
> (iv) around-the-clock monitoring by V2 Global pursuant to a concrete security plan (provided to the government) outlining the procedures and protocol that can be implemented and addressing contact with law enforcement authorities, staffing, technology, the monitoring post, and movements.

A-364-374. Alon added that neither the defense nor the government had located any case where private security conditions failed and the defendant either absconded or harmed the community. A-366-367. The government continued to argue that wealth made the Alexanders a risk of flight, this time asserting that the parents' willingness to tender all their wealth for their sons' bond "just goes to show that they will do anything for their sons, that they will put up anything to get them out of jail, to help them avoid facing these charges. There's absolutely every incentive here to flee." A-376.

Magistrate Judge Sanchez held that Alon had rebutted the presumption of detention, and that conditions could alleviate any potential danger to the community,

but that no conditions could reasonably assure Alon's appearance. Specifically, Magistrate Judge Sanchez found that "I do think that there is dangerousness here, [but] I think that conditions could be fashioned, a combination of conditions, to address any type of danger that is presented here." A-383.

However, as to flight, Magistrate Judge Sanchez stated that while he does "recognize that the defendant has, aside from this, really, his personal circumstances are not the sort that would normally present an issue on risk of flight," it was "concerning to the Court" that he had ties to other countries, "particularly Israel." *Id*. The court stated:

> While I do recognize there is an extradition treaty with Israel, I do recognize that just because there is an extradition in place does not make it easy to extradite someone from a foreign country, and that it would be difficult, potentially, for someone who is the citizen [sic] of Israeli citizens, whose wife is an Israeli citizen, who could potentially even be deemed, as I understand it because of the circumstances, akin to an Israeli citizen or given similar protections.

A-384. The Court issued a written order detaining Alon. A-25.

The third Alexander brother, Oren, stipulated to detention in Florida, retaining the right to contest detention in New York.

## B. Alon and Oren Alexander Pass Polygraph Examinations

On January 13, 2025, retired FBI Special Agent James T. Orr conducted polygraph examinations of Alon and Oren while the brothers were in custody at FDC-Miami. Alon was asked if he had ever had sex with any woman he knew had

20

been covertly given drugs, which Alon denied. A-129. Oren was asked questions about Victim 2, as alleged in Count III of the Superseding Indictment, and whether he had sex with her knowing that she had secretly been given drugs, which Oren denied. A-109. Both brothers passed the examination; their polygraph reports state that there were "no significant reactions indicative of deception" by either of them. A-110, A-130.

On January 15, 2025, the brothers filed the polygraph reports as exhibits ahead of the detention hearing to be held in the Southern District of New York. A-104. They cited in support *United States v. Fox*, 602 F. Supp. 3d 434, 441 (W.D.N.Y. 2022), *aff'd* No. 22-1043, 2022 WL 2564600 (2d Cir. July 8, 2022), where the defendant passed a similar polygraph examination and was released pretrial under enhanced conditions of home confinement including video monitoring. Along with the polygraph reports, the brothers also filed the vitae of Agent Orr and a list of all the polygraph examinations he conducted that were admitted in federal and state courts. A-115.

## C. The Detention Hearing in the Southern District of New York

On January 5, 2025, the government submitted a letter to Judge Caproni (SDNY) jointly requesting, along with defendants, that the Court schedule a consolidated hearing to decide the issue of bail for all three brothers. *See* 24-CR-00676 (S.D.N.Y.), ECF#16.

21

Tal and Alon moved to revoke their detention orders. A-29, A-41. Oren opposed detention and proffered his ties to the community, including through his involvement and leadership in philanthropic events in the Miami area. A-62, A-72. Oren attended college in Colorado and graduated in three years. A-72. He arrived in New York in 2008, where he got his start in real estate, building his business from the ground up, and as he became successful, he continued to give back to his community. *Id.* Oren has been with his wife, Kamila, for several years; on Christmas day 2024, she gave birth to their first child, a baby boy. A-73. Oren submitted letters from friends attesting to his community ties and that he is not a flight risk and will strictly adhere to any release conditions. A-139. Oren's wife Kamila explained in her letter that although "I was born in Brazil, I left 15 years ago and have no significant connections or reason to ever return." A-140. And Oren's former girlfriend, now a member of the New York Bar, wrote that "I never experienced any violence, sexual or otherwise—or anything close to it—in the course of my relationship with Oren. Indeed, I never found Oren to be pushy or aggressive with respect to sex. I also never witnessed Oren being violent to any other person." A-142.

The Alexander brothers proposed conditions of release as follows:

**a.** A bond in any dollar amount, co-signed by the Alexander parents and secured by the entirety of the family's wealth, as demonstrated in a schedule of the family's assets submitted under seal;

**b.** Surrender passports;

22

**c.** Surrender the U.S. and Israeli passports of the Alexander parents;

**d.** Surrender of spouse passports;

**e.** Surrender of children's passports;

**f.** Execution of waivers of extradition;

**g.** Home confinement with GPS monitoring at any location approved by the Court;

**h.** Armed security guards stationed at the location of home confinement at all times (24 hours per day, every day) to ensure compliance with the conditions imposed by the Court;

**i.** Private security personnel will be present at the location of home confinement 24 hours per day, every day;

**j.** Private security will install video cameras and door and window sensors and alarms, which they will monitor;

**k.** Private security may wiretap and monitor the Alexanders' phone and computer activity and report to the Court any violations of bail conditions;

**l.** The brothers consented to members of the private security team using force as they deem appropriate to prevent the Alexanders from fleeing;

**m.** Private security personnel will accompany the Alexanders for any necessary travel away from home confinement (*e.g.*, to and from court);

**n.** The Alexanders will bear the cost for all private security services;

**o.** Restricted access to home to visitors approved by Pretrial Services; and

**p.** Authorization for the government to search the location of home confinement at any time to ensure compliance with bail conditions.

A-44-45. The Alexanders proposed to reside in the same apartment, so that all security personnel could supervise all three in the same location. A-466; A-515. The brothers proposed that they and their parents and spouses would all sign on the bond, and agreed that if any one of the brothers violated the bond conditions, the bond would be forfeited, rendering the entire family destitute. A-50.

In two letters submitted to Judge Caproni, the government again argued that the Alexanders posed a risk of flight due to their substantial wealth. First the government argued that the Alexanders' "ample financial resources" "create significant risk of non-appearance" and made it so that "if the defendants wanted to flee, they have the means to do so quickly and without detection" by chartering a "private jet":

> Oren and Tal Alexander are real estate agents who focus on ultra-luxury markets in Miami and New York City…[They were] responsible for securing significant brokered deals, including a nearly $240 million sale of a penthouse in 2019 which, at the time, was the most expensive residential sale in United States history…All three defendants reside in high-value properties in Miami Beach and New York. Since about 2019, Tal Alexander has rented an apartment in a building that is part of "billionaires' row"...

> The defendants' ample financial resources also create significant risk of non-appearance. As discussed above, Tal and Oren are successful real estate agents in the luxury market, have significant professional and social ties to other high-powered individuals, and regularly close large transactions that result in significant commissions. And each of the defendants lives a lifestyle supported by their extensive financial resources. Alon and Oren even live in private residences with direct water access to the Atlantic Ocean. All three defendants regularly fly on private jets, a means of travel that is more difficult for law

24

enforcement to track. In short, if the defendants wanted to flee, they have the means to do so quickly and without detection.

A-19.

In a subsequent letter to Judge Caproni before the detention hearing, the government repeated that "[in] short, the defendants have the vast financial resources to ensure that if they chose to flee, they could do so quickly and without detection." A-82. In the government's view, the Alexanders' "wealth only exacerbates [their] already clear risk of flight" created by the nature of offense, possible sentences, reputational harm, strength of the evidence, international contacts, and international travel. A-83. In a final shot at the Alexanders' wealth, the government argued that by offering private security, the Alexanders were the latest example of wealthy defendants trying to buy special treatment in the justice system:

> In offering to hire private guards, rather than subject themselves to a quotidian federal detention center, the defendants have become the latest examples of wealthy individuals charged with sex trafficking and similar offenses who have attempted to buy their way out of federal detention by funding their own private jails. Courts presented with these proposals have rejected them for what they are: efforts to use money and privilege to receive special treatment in the justice system.

*Id.*

Judge Caproni held a detention hearing for all three brothers on January 15, 2025. Present at the hearing were John Mazzella of Kroll and Tony Valente, an independent contractor retained by Kroll, who were available to propose a security plan for the supervision of the Alexanders in New York. Mr. Mazzella is a veteran

fraud investigator with over 25 years of experience in the Justice Department, the Labor Department's office of labor racketeering, and in financial records, informants, and international fieldwork. Mr. Valente is an independent contractor with significant experience in home detention scenarios, having spearheaded the conditions set for Bernie Madoff, Dominique Strauss-Kahn, Cameron Douglas, and Mahender Sabhnani (who was charged with slavery). A-404. Matt Dumpert, who was not present at the hearing but would be involved in supervising the Alexanders, previously served in the Department of State's Diplomatic Security Service, where he advised on international security, counterespionage, and counterintelligence programs. *Id*. Dumpert has a specific expertise in the logistics of home detention and surveillance and leads Kroll's enterprise security risk management practice.

Judge Caproni stated that she was familiar with Mr. Mazzella and Mr. Valente, noting "Mr. Valente and Mr. Mazzella are good guys. I don't have a problem with them." A-403. Defense counsel proposed a "home detention package" to include, if needed, a private armed security stationed at the location at all times, with a team comprised almost entirely of retired federal agents and NYPD officers, and off-duty law enforcement officers with arrest authority, in addition to electronic monitoring and other standard conditions of release. A-413-414.

The Alexanders argued that they did not pose a risk of flight because they were United States citizens with significant ties to South Florida, the strength of the

26

government's case was overstated, and, "most salient[ly]," they had not fled in the preceding six months after the New York Times, Bloomberg, and the Wall Street Journal reported on the FBI's investigation. A-405. The Alexanders also argued that under *Boustani,* the Court is authorized to release a defendant on private security conditions where, but for the defendant's wealth, the defendant would not have been detained. A-406-407.

During the presentation on the weight of the evidence, defense counsel raised the fact that Oren and Alon had passed polygraph examinations. The Court declined to consider the polygraphs despite counsel's argument that the government has used polygraphs at bond hearings and that, in considering the strength of the evidence at a bond hearing, the district court in *Fox* had given weight to the fact that Fox "passed a polygraph in which he was asked several times whether he had ever had non-consensual sex with anyone and answered 'no.'" A-435 (citing *Fox*, 602 F. Supp. 3d at 441).

The Court admonished defense counsel and suggested that the defense only arranged the polygraph examination as a media ploy, stating, "[A]s you know, polygraphs are not admissible….You want all of these guys [*i.e.*, members of the press at the hearing] to hear that." *Id.* When Alon's counsel tried to explain, the Court repeated, "Again, you wanted it for the press, but it's not moving me." A-462. And the Court expressed doubt about the veracity of polygraphs in general:

> MR. KLUGH (counsel for Oren): I understand, but they have been used even by the government. This is a polygrapher who trained other FBI polygraphers. He had many, many years in both offices. He was sent to another office in Florida to train and mentor. This is an extraordinary polygrapher who provides complete detail, complete graphs, showing that the level of confidence that Oren Alexander is telling the truth, and Alon as well, is like ten times what you would need to be sure that the person – relatively confident the person is telling the truth.
>
> THE COURT: You believe in polygraphs.
>
> MR. KLUGH: Your Honor, I have one thing that I know. When one party is willing to be polygraphed, and the other party's witnesses are not willing to be polygraphed, I take that in consideration.

A-435-436. The Court also declined to consider the fact that Alon and Oren were willing to be polygraphed as evidence that they are truthful, stating that "if they had failed the polygraph [which they did not], that polygraph would have never seen the light of day." A-504. Defense counsel responded:

> The polygraph was taken in front of a whole bunch of federal officers. That's what I'm saying. Part of problem with having clients in jail, that they have to be taken in a very difficult room with a federal officer coming in and checking on him once in a while. You have to do all kinds of forms you have to fill out. You have to make a very public.

*Id.*

Next, the government reiterated the arguments it made at the detention hearings in Florida that the weight of the evidence is strong, and the brothers pose a danger to the community. A-471-481. The government admitted that the last reported alleged incident was in October of 2021, but argued that there is no "evidence that it stopped." A-483. Defense counsel responded, "I don't know what evidence you need

28

more than the absence of evidence, the absence of anybody making these accusations since 2021. As to Alon, the government today said that the last accusation was in 2018." A-508. So "[t]he suggestion that if they're on home detention, they're going to return to the kind of behavior the government claims they did before 2018, once again, is a fanciful theory." *Id*.

As to flight, the government argued that the Alexanders pose a risk of flight for "so many" reasons, including wealth, and ultimately "what matters is the ability to travel, the inclination to travel, the ability to pick up somewhere else and to reestablish the life there." A-487, A-490.

### D. The Court Denied the Alexanders' Motion for Bail

The Court denied all three of the Alexanders' motion for bail. The Court did not issue a written order but stated its findings on the record at the conclusion of the detention hearing. The Court characterized the defendants' argument as "in essence…both their dangerousness and their risk of flight can be mitigated…whatever risks there are can be mitigated because they have the wealth to create, in essence, a private prison outside the control of the Bureau of Prisons." A-516. Despite the fact that the Court did not "have a problem with" the security contractors from Kroll, the Court held it was foreclosed from considering this option under *Boustani.* Quoting that case, the Court held:

> Controlling Second Circuit authority expressly prohibits the Court from going down that trail. As the Circuit said in *Boustani*, quote, we now

expressly hold that the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial, while wealthy defendants are released to self-funded private jails. It is a fundamental principle of fairness that the law protects the interest of rich and poor criminals in equal scale, and its hand extends as far to each.

To interpret the Bail Reform Act as requiring district courts to permit wealthy defendants to employ privately-funded armed guards, where an otherwise similarly-situated defendant without means would be detained, would violate this core principle. Such a two-tiered system would foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy.

A-516-517.

### i. *Danger to the Community*

Although two different magistrate judges had found that conditions of release could be fashioned to mitigate any danger to the community, the District Court held that the Alexanders posed a future danger to the community that required detention. A-517. This finding was based on the proffer of the historical allegations against the Alexanders:

> [THE COURT:] This is a presumption case. Even if it were not, there is no question that the government has shown, by clear and convincing evidence, that these defendants pose a risk to the community. The government has proffered that over many years, they have sexually assaulted women. The nature and circumstances of that offense weigh in favor of a finding of dangerousness…
>
> The weight of the evidence is strong... [T]he government's proffer is that more than 40 women have made such allegations against these defendants, and there is a consistency in the details about how they are lured into an area under the defendant's control and then drugged and

assaulted. That tends to corroborate their stories that these victims are not fabricating what happened to them.

Further, the government proffers that there is videotape corroboration of at least some of the victims' stories, with a victim who is obviously and visually incapacitated. In short, the evidence against them is strong.

A-517-518. The Court rejected the Alexanders' arguments that there is no evidence or allegation of misconduct after 2021, stating:

I'm not as sanguine as the defense is, that that means that with their marriage, they have changed their stripes and are now staying home with their wife and not engaging with other women. They pose a danger to unsuspecting women to be drugged and raped, and that's a serious danger.

A-518. The Court held that the Alexanders' "proposed mitigation of that danger is a private prison, which for the reasons discussed, *cannot be considered." Id*. (emphasis added).

ii. *Risk of Flight*

The Court next turned to risk of flight. The Court found that the government showed by a preponderance of the evidence that the defendants posed a risk of flight, relying in part on their wealth and alleged foreign ties:

Their parents own substantial real estate in a foreign country. Alon is married to a woman who is a citizen of a foreign country, and his wife has family in that country. Oren is married to a woman who is a citizen of a foreign country. Tal has no spousal connections to overseas, but his, as well as the other defendants' grandmother, lives overseas. Put differently, although they all have substantial ties to the United States -- they're all United States citizens -- they all have ties to other countries.

31

A-519. The Court also pointed to the substantial jail time the defendants faced if convicted, the "very substantial reputational harm" to the defendants, and the defendants' desire to spare their families from "what is going to be a horrible trial for their family to sit through." *Id*. The Court ruled that the Alexanders "both pose a substantial risk to the safety of the community and a flight risk, and there is no condition or combination of conditions *that are consistent with the Bail Reform Act* that would reasonably ensure the safety of the community and the appearance of the defendants at trial." A-520 (emphasis added).

On February 7, 2025, the defendants appeared before the District Court for a status conference and arraignment. *See* 24-CR-00676 (S.D.N.Y.), ECF#53. At that hearing, the District Court set a trial date of January 5, 2026. *Id*. The government informed the Court that it intends to further supersede the indictment. ECF#54:19.

## SUMMARY OF THE ARGUMENT

To seek the detention of the Alexander brothers, the government repeatedly argued that the brothers are multimillionaires with a fortune at their disposal, making them a high risk that they will flee to a foreign land for the rest of their lives.

The Bail Reform Act provides that a judge may release a defendant under "the condition that the person . . . remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that

the person will appear as required and will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3142(c)(1)(B)(i).

The Alexander brothers—U.S.-born citizens with no criminal history—proposed a multimillion-dollar bond secured by their entire life savings and those of their parents, and release to electronically-monitored home confinement in the custody of private security personnel who would supervise the brothers 24/7, at the brothers' expense.

The District Court rejected the proposal out of hand. The Court held that under *Boustani* and the "fundamental principle of fairness that the law protects the interest of rich and poor criminals in equal scale," the Bail Reform Act prohibits releasing a wealthy defendant to the custody of a private security firm that a poor defendant cannot afford.

The District Court erred. The brothers proposed conditions of release, authorized by the Bail Reform Act, that would reasonably assure their appearance in court and the safety of the community.

## STANDARD OF REVIEW

The standard for the release/detention determination is whether there are conditions of release that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B) and § 3142(e)(1). If the court determines that release on recognizance

will not reasonably assure the defendant's appearance or community safety, the court "shall order the pretrial release of the person . . . subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." U.S.C. § 3142(c)(1)(B).

Where a defendant is charged with sex trafficking under 18 U.S.C. § 1591, as the Alexanders are in this case, there is a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(D).

The presumption is of limited force: it may be rebutted by the defendant who "bears a limited burden of production…by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States v. Mattis*, 963 F.3d 285, 290 (2d Cir. 2020). Once a defendant has met his burden of production ... the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. *Mattis*, 963 F.3d at 290-91. But, at all times, "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the

community," and "by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *Id.; Mercedes*, 254 F.3d at 436.

Rulings of law in bail proceedings are reviewed *de novo*, while historical facts are reviewed for clear error. *United States v. English,* 629 F.3d 311, 319 (2d Cir. 2011). "[The] scope of review is slightly broader with respect to the 'ultimate determination' that a defendant does, or does not, present a risk" of flight or danger. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995). Whether conditions will reasonably assure the defendant's appearance and community safety is a mixed question of law and fact reviewed for clear error. *Id.* "The clearly erroneous standard does not apply . . . if the court has made an error of law," in which case the court's findings "should be set aside." *United States v. Shakur*, 817 F.2d 189, 196-97 (2d Cir. 1987).

## ARGUMENT

### I. The District Court Misapplied The Bail Reform Act When It Rejected Out Of Hand Statutorily Authorized Conditions Of Release, Including The Retention Of A Private Security Firm To Serve As A Custodian, That Would Reasonably Assure The Defendants' Appearance In Court And The Safety Of The Community.

District courts in the Second Circuit have released wealthy defendants to the custody of private security firms on multiple occasions, at times with the government's consent. In some cases, the defendants had minimal ties to the U.S. and some were not even U.S. citizens. A few were nationals of countries that do not

extradite their citizens to the U.S. As far as undersigned counsel have been able to determine, none of the defendants released to the custody of private security absconded or caused harm to anyone while on pretrial release.[2]

In addition to the district courts granting release to the custody of private security, this Court has upheld private security as a condition of release in two cases,

---

[2] *See United States v. Ng Lap Seng,* No. 15-cr-706 (S.D.N.Y.), ECF#53; 570; 616 (release granted to billionaire Chinese national on a $50 million bond with home confinement in a Manhattan apartment and 24/7 private armed security; defendant was "wildly wealthy" and China does not extradite its citizens to the United States); *United States v. Webb*, No. 15-cr-252 (E.D.N.Y. July 20, 2015), ECF#40 (with the government's consent, release granted to a Cayman national charged in FIFA scheme; $10 million bond with home detention, electronic monitoring, and 24/7 private security); *United States v. Burzaco*, No. 15-CR-252 (E.D.N.Y. July 31, 2015), ECF#57 (with the government's consent, release granted to Argentinian national charged with fraud and money laundering conspiracy; $20 million bond with electronic monitoring and home detention secured by a private security firm); *United States v. Marin,* No. 15-CR-252 (E.D.N.Y. Nov. 3, 2015), ECF#74 (with the government's consent, release granted to Brazilian national, $15 million bond with electronic monitoring and home detention secured by a private security firm); *United States v. Napout,* No. 15-CR-252 (E.D.N.Y. Dec. 16, 2015), ECF#127 (without objection, release granted to foreign national with Paraguayan and Italian passports and limited ties to the United States; $20 million bond with house arrest at an apartment in Florida and 24/7 private security and video surveillance); *United States v. Dreier,* 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) (release granted to defendant who had assumed a false identity, was "not only a master of deceit and a doyen of dishonesty but the kind of person who, under stress, may resort to desperate measures," and his "motive to flee is palpable, for he faces potentially large sentences if convicted"; $10 million personal surety bond signed by Drier's son and mother with home confinement and on-premises armed security guards); *United States v. Madoff,* 586 F. Supp. 2d 240, 255 (S.D.N.Y. 2009) (release granted to Madoff who committed one of largest frauds ever and conviction was a virtual certainty because he confessed; $10 million bond with home confinement and 24-hour monitoring by private security); *United States v. Cosmo,* No. 2:09-cr-00255 (E.D.N.Y. Jul. 23, 2009), ECF#61 (release granted to defendant accused of running

*United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007), and *United States v. Esposito,* 749 F. App'x 20 (2d Cir. 2018). In *Esposito*, the district court required private security over defense objection, which the defendant appealed. Not only did the government defend the use of private security as an added measure of pretrial supervision, but this Court affirmed, holding that district courts are not precluded from requiring private security as a condition of release "when the defendant has substantial resources and such wealth *contributes* to his risk of flight." 749 F. App'x at 24 (emphasis added).

The year after *Esposito*, this Court decided *United States v. Boustani,* a fraud and money laundering case where the district court denied Boustani's proposal that he be released to home confinement under the supervision of private security. This Court summarily affirmed, 2019 WL 3231097 (2d Cir. May 16, 2019), later writing a brief opinion "to clarify the circumstances under which the Bail Reform Act permits a District Court to release a defendant pending trial pursuant to a condition

---

a $413 million Ponzi scheme; $1.25 million bond with home detention at his parent's house, electronic monitoring, and escorted by the security whenever he needed to leave the premises); *United States v. Schlegel,* 2008 WL 11338900, at *1 (E.D.N.Y. June 13, 2008) (release granted to defendant charged with fraud and obstruction of justice where Government contended that the defendant "was a sophisticated businessman of considerable wealth and had the means and ability to flee"; $400 million bond with home confinement and two private security officers); *United States v. Sabhnani,* 493 F.3d 63, 77-78 (2d Cir. 2007) (discussed in detail below); *United States v. Gotti,* No. 7:98-CR-42 (S.D.N.Y. Oct. 01, 1998), ECF#270 (court released John Gotti, Jr., who was facing multiple RICO charges, to home confinement with electronic monitoring and a security guard posted at Gotti's home at all times paid for by Gotti).

under which the defendant would pay for private armed security guards." *Boustani*, 932 F. 3d at 79.

The opinion explained that the Court had "previously recognized that, in limited circumstances, a court may release a defendant subject to conditions of home confinement in which, among other things, the defendant pays for private armed security guards." *Id*. at 81 (citing *Sabhnani*, 493 F.3d at 78, fn. 18). "[S]uch home confinement, combined with other restrictive conditions, may suffice to reasonably assure the defendant's appearance in court." *Id.* at 81. But the Court had "no occasion to consider whether it would be *contrary to principles of detention and release on bail* to allow wealthy defendants to buy their way out by constructing a private jail." *Id*. at 81-82 (emphasis added). The Court observed it had previously expressed "concerns with the idea of granting bail to defendants because of their wealth," and that "conditions such as supervision by privately hired security guards may not be appropriate for wealthy defendants when similarly situated defendants of lesser means would be detained." *Id*. at 82. The Court then said:

> We now expressly hold that the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails. It is a fundamental principle of fairness that the law protects "the interests of rich and poor criminals in equal scale, and its hand extends as far to each." To interpret the Bail Reform Act as requiring district courts to permit wealthy defendants to employ privately funded armed guards where an otherwise similarly situated defendant without means would be detained would violate this core principle. Such a two-tiered system would

38

> "foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy."

*Id*. The opinion does not set out how the Court reached this conclusion. In a footnote, the Court cited *Smith v. Bennett*, 365 U.S. 708, 714 (1961), as the source of the quote about the hand of the law extending equally to the rich and the poor, but the Court did not analyze *Smith* in the context of bail nor cite to any part of the Bail Reform Act that would support the Court's holding.[3]

After finding that private security is prohibited by the Bail Reform Act, the Court carved out the following exception:

> That said, the private-security condition we described in *Sabhnani* may be appropriate where the defendant is deemed to be a flight risk primarily *because of* his wealth. In other words, a defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained. By contrast, if a similarly situated defendant of lesser means would be detained, a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention. Such a limitation on private-security conditions ensures that the standards of the Bail Reform Act are applied equitably to all defendants.

*Id*. (emphasis in original). The Court cited no statutory authority providing that "a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention."

---

[3] *Smith* involved indigent inmates in Iowa who were required by statute to pay a $4 filing fee before their habeas corpus petitions were docketed with the court. The Supreme Court held that a State may not require an indigent person to pay a filing fee they cannot afford before granting them access to the writ. *Id*. Unlike the Iowa statute, the Bail Reform Act does not require that indigent defendants pay for private security they cannot afford before they are granted pretrial release.

Actually, the opposite is true. The Bail Reform Act expressly authorizes that, in lieu of government custody, a defendant may be released into "the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3142(c)(1)(B)(i). The Act does not prohibit paying the costs for the "designated person" to take "custody" and "assume supervision" of the defendant. That is precisely what the Alexander brothers proposed, but the District Court rejected it out of hand, relying on *Boustani*. In all events, the procedural history of the instant case reveals that the Alexander brothers were deemed a flight risk primarily, if not exclusively, because of their wealth—a scenario that the *Boustani* court identifies as one in which retention of a private security firm is authorized.

### A. The Supervision of a Defendant by a Third-Party Custodian Has Been a Proper Condition of Pretrial Release Since the Founding.

By the time of our Founding, "pretrial release on bail was a fundamental part of English constitutionalism, with procedural protections developed in Magna Carta, the Petition of Right, the Habeas Corpus Act, and the English Bill of Rights." Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 Harv. L. Rev. 1816, 1828 (2024). Together, these statutes required that bail determinations be made in open court and with an evidentiary record. *Id.* The central meaning of "bail" was

established by Lord Coke as "derived of the French word Bailer, which signifieth to deliver, because he that is Bailed, is as it were delivered into the hands and custody of those that are his Pledges and Sureties." *Id.* at 1828-29. Blackstone later revised the definition of bail as "a delivery, or bailment, of a person to his sureties, upon their giving (together with himself) sufficient security for his appearance: he being supposed to continue in their friendly custody, instead of going to gaol." *Id.* at 1829. Thus, "bail denoted the process of release: from the custody of the state to the 'friendly' custody of sureties—family, friends, employers, or neighbors who would guarantee the defendant's presence at court.'" *Id.*

In the United States, the same Congress that proposed the Eighth Amendment also formulated the Judiciary Act of 1789, which granted an explicit right to bail. *See* Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 338 (1982) (providing the history of the Judiciary Act of 1789 and the right to bail).

As early as 1858, the Supreme Court ruled that a defendant who is released on bail upon the recognizance of a surety is released to the "friendly custody" of the surety as "a continuance of the original imprisonment." Thus, in *Devine v. State*, where the Court considered the responsibility of a surety for the non-appearance of the defendant, the Court held:

> In legal contemplation, upon the recognizance being entered into, the principal was delivered into the "friendly custody" of his sureties,

41

> instead of being committed to prison. 4 Bla. Com. 301. The sureties had control of his person; they were bound at their peril, to keep him within the jurisdiction, and to have his person ready to surrender when demanded. If apprehensive for their own safety, they had the right to arrest and commit him to prison, at any time, so as to have him forthcoming to answer the charge of which he had been indicted, as they had voluntarily undertaken to do. And if they negligently permitted him to go beyond their reach, it was their own folly, and they must abide the consequences.

*Devine v. State*, 37 Tenn. 623, 625-26 (1858). A few years later, the Court reiterated that "[w]hen bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done." *Taylor v. Taintor*, 83 U.S. 366, 371 (1872).

The fundamental bail statute promulgated under the Judiciary Act of 1789 remained in force until 1966, when Congress enacted the first major substantive change in federal bail laws. The Bail Reform Act of 1966, and in particular 18 U.S.C. § 3146(a)(1), provided that release of the defendant to a responsible custodian (either a designated person or an organization) was "*the first*" condition of release that the court "shall . . . impose" if the court determined that release on recognizance would not reasonably assure the appearance of the defendant. Other conditions included a cash bond in a specified amount or a bail bond "with sufficient solvent sureties." The statute provided:

42

### § 3146. Release in noncapital cases prior to trial

**(a)** Any person charged with an offense, other than an offense punishable by death, shall . . . be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond in an amount specified by the judicial officer unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required. When such a determination is made, the judicial officer shall, either in lieu of or in addition to the above methods of release, impose *the first of the following conditions of release* which will reasonably assure the appearance of the person for trial or, if no single condition gives that assurance, any combination of the following conditions:

> **(1)** *place the person in the custody of a designated person or organization agreeing to supervise him*;
>
> **(2)** place restrictions on the travel, association, or place of abode of the person during the period of release;
>
> **(3)** require the execution of an appearance bond in a specified amount and the deposit in the registry of the court, in cash or other security as directed, of a sum not to exceed 10 per centum of the amount of the bond, such deposit to be returned upon the performance of the conditions of release;
>
> **(4)** require the execution of a bail bond with sufficient solvent sureties, or the deposit of cash in lieu thereof; or
>
> **(5)** impose any other condition deemed reasonably necessary to assure the appearance as required, including a condition requiring that the person return to custody after specified hours.

18 U.S.C. § 3146(a)(1) (West 1966) (emphasis added). Two of these statutory conditions (3 & 4) depended entirely upon a defendant having sufficient access to wealth—whether his own or that of family and friends—to secure his release.

The bail statute was amended by the Bail Reform Act of 1984. The revised statute retained "the familiar third-party custodian provision…with one major change…To assure that third party custodians are chosen with care, the condition has been amended to require that the custodian agree to report any violation of a release condition and that he be reasonably able to assure the judge that the person will appear as required and that he will not pose a danger to the safety of any other person or the community." S. Rep. 98-225, 14, 1984 U.S.C.C.A.N. 3182, 3197; 1983 WL 25404 *14 (Leg. Hist.) (Aug. 4, 1983). The purpose of the revision was not for "the custodian be held liable if the person to be supervised absconds or commits crime," but rather to "alert the judicial officer to the necessity of inquiring into the ability of proposed custodians to supervise their charges and to impress on the custodian the duty they owe to the court and to the public to carry out the supervision to which they are agreeing and to report any violations to the court." *Id.*

In its current form, the bail statute (18 U.S.C. § 3142) expressly provides that the court may release a defendant pretrial to the custody of a responsible third-party custodian "who agrees to assume supervision" of the defendant with no prohibition based on wealth or the cost of such supervision. 18 U.S.C. § 3142(c)(1)(B)(i). Instead, the statute only requires that the custodian be able "reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community":

44

**18 U.S.C. § 3142 – Release or detention of a defendant pending trial**

\* \* \*

**(c) Release on conditions.**

> **(1)** If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person—

> \* \* \*

> > **(B)** subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person—

> > > **(i)** *remain in the custody of a designated person, who agrees to assume supervision* and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community . . .

18 U.S.C. § 3142(c)(1)(B)(i) (emphasis added). During the Alexanders' detention hearing, the District Court expressed no doubt that the Kroll security team proposed by the Alexanders would discharge these responsibilities dutifully, as they had done previously when they supervised high-profile defendants like Bernie Madoff, Dominique Strauss-Kahn, Cameron Douglas, and Mahender Sabhnani. A-404, A-468. Rather, the District Court categorically rejected the proposed condition of

having private security serve as custodians on the basis that it would be too expensive for most defendants to afford.[4]

### B. The Current System of Pretrial Release Considers the Defendant's Wealth When Setting Conditions, Including Bail.

In addition to release to a third-party custodian, § 3142(c) provides that the Court may properly release the defendant on financial conditions as may be reasonably necessary to assure the defendant's appearance. For example, the statute expressly provides that the district court may require an agreement by the defendant to "forfeit property" that is "of sufficient unencumbered value, including money, as is reasonably necessary to assure" his appearance. 18 U.S.C. § 3142(c)(1)(B)(xi). The court may also require posting "a bail bond with solvent sureties" who must agree to forfeit any amount of money or property "reasonably necessary to assure the appearance of the person." 18 U.S.C. § 3142(c)(1)(B)(xii). If the surety is not "an approved surety," (for example, under 31 U.S.C. § 9304 & 9305), then the surety must provide a statement of "assets and liabilities," showing "a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond." 18 U.S.C. § 3142(c)(1)(B)(xii); *see also* Fed. R. Crim. P. 46(e) ("[t]he court must not approve a bond unless any surety appears to be qualified. Every surety, except a legally

---

[4] The district court did not inquire about, or make findings regarding, the cost of having Kroll serve as a private security custodian for the Alexander brothers. This brief presupposes that not all defendants would be able to afford private security for an extended period of time—in this case, one year between arraignment and trial.

approved corporate surety, must demonstrate by affidavit that its assets are adequate"). In considering "whether the prospect of forfeiture by the third party would be sufficient to assure the appearance of the defendant," that assurance "generally . . . will exist where there is a close relationship between the defendant and the third party, such as a family tie." S. Rep. 98-225, 14, 1984 U.S.C.C.A.N. at 3198; 1983 WL 25404 *15.

Far from offending notions of fairness or trying to "buy" justice, as the government argued below, the Alexander family offering their entire life savings as security for the Alexanders' bond and proposing that the brothers be released to private security personnel are conditions of release expressly contemplated by the bail statute. These conditions are not about wealth or poverty; they are about providing a constitutionally-guaranteed option for preserving pretrial liberty while ensuring community safety and appearance in court. Not every defendant will have the means to post bail, offer money or property as collateral, or find sureties willing to tender their assets to secure the defendant's bond. Nor will every defendant be able to find a third-party custodian, whether paid or unpaid, who is prepared to "assume supervision" of the defendant or who "is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community."

But this does not mean that wealthier defendants who are able to meet these financial conditions of release, like the Alexander brothers, must be detained in an effort to equalize bail decisions across defendants with different economic circumstances. While the court must give poor defendants the opportunity to post non-excessive bail, § 3142 does not require that the court impose on wealthy defendants only those conditions of release that would be affordable to poor defendants. This would be irrational and unworkable in light of the goals of the statute to ensure that there is sufficient financial incentive not to flee. Indeed, when Judge Caproni was considering the financial portion of a proposed bail package for the Alexanders, Judge Caproni commented that "a million dollars is nothing to this family." A-454. Nowhere in the statute are courts authorized to consider the defendant's wealth only to impose a financial *burden* (*e.g.*, conditions of release that could result in the defendant losing his wealth) yet prohibit defendants from using that same wealth to obtain appropriate *relief* from pretrial detention (*e.g.*, paying for security measures that mitigate risk of flight, danger, or both).

The private security measures proposed by the Alexanders are an added, more stringent condition of release that serves a legitimate purpose under § 3142 and are reasonable and effective in light of the District Court's expressed concerns. Supervision by private security personnel supports the statutory goals of ensuring the Alexanders' appearance in court and community safety. By placing the

48

Alexanders in the custody of security professionals, the District Court would have assurances that their movements and activities are being supervised; this supervision ensures that the defendants attend all court appearances and pose no danger to others.

The right to bail in an amount that is not excessive does not mean that bail must be equally affordable across economic classes. To hold otherwise would require the elimination of the bail system altogether, as not all defendants are able to afford the same conditions of bail. But in passing the Bail Reform Act of 1984, the Committee explained that although the statute prohibits imposing a financial condition of release that would result in the detention of the defendant (18 U.S.C. § 3142(b)(2)), this "does not necessarily require the release of a person who says he is unable to meet a financial condition of release which the judge has determined is the only form of conditional release that will assure the person's future appearance." S. Rep. 98-225, 14, 1984 U.S.C.C.A.N. at 3199; 1983 WL 25404 *16. The Committee explained that if the court "determines that a $50,000 bond is the only means, short of detention, of assuring the appearance of a defendant who poses a serious risk of flight, and the defendant asserts that, despite the judicial officer's finding to the contrary, he cannot meet the bond, the judicial officer may reconsider the amount of the bond." *Id.* But if the court "still concludes that the initial amount is reasonable and necessary then it would appear that there is no available condition of release that will assure the defendant's appearance…and therefore the judge may proceed with

49

a detention hearing…and order the defendant detained, if appropriate." *Id.* In that situation, the defendant is detained not because he is poor, but because the court deems the financial condition necessary to ensure the defendant's appearance at trial and safety of the community.

Similarly, the court can require that in addition to individual sureties, a defendant post a corporate surety bond. The corporate surety, or bondsman, charges a non-refundable fee, typically a percentage (10-15%) of the face amount of the bond, and requires that the defendant provide collateral (usually money or real property) to secure the bond. This fee-based financial arrangement is an established method to help ensure the defendant's appearance in court and is imposed routinely by the district courts. Although some defendants may not be able to pay the bondsman's fee and will be detained on danger or risk of flight, this does not mean that their detention is contrary to the Bail Reform Act or pursuant to a two-tiered system of justice that favors the wealthy. Similarly in this case, defendants who are unable to post the same bail as the Alexanders or pay the cost of private security would be detained not because they are poor, but because they cannot otherwise mitigate the risk of flight or danger to the community that they pose.

The condition of a third-party custodian, even if a private security firm, is an option for every pretrial detainee. Unlike a corporate surety bond where the court requires that the defendant retain, at his own expense, a bondsman to obtain release,

no financial condition is imposed by the court when releasing a defendant to a "designated" custodian. That the proposed custodian—in this case, Kroll—may charge a fee for its services does not mean that the bail statute prohibits the Alexanders from using their own funds or their parents' funds to offer this additional condition to satisfy the court's concerns regarding flight and community safety. The court's focus under the Bail Reform Act must be on whether the conditions proposed by the Alexander brothers are authorized under the Act and will ensure community safety and appearance, not on whether other defendants can pay for those conditions.

Wealth impacts multiple facets of pretrial release and courts routinely make bail determinations that may have disparate effects on people from different economic backgrounds. For example, defendants are routinely placed on electronic monitoring as an alternative to custodial detention. Most electronic monitoring programs charge a fee, which may be reduced or waived for indigent defendants. But this does not eliminate the related costs that an indigent defendant would still have to pay in order for electronic monitoring to work, such as having a permanent address where to reside, telephone service (often a landline), and electricity to charge the device.

Other alternatives to pretrial detention that aim to ensure the safety of the community or the defendant's appearance may be out of reach for poor defendants. For example, the court may grant pretrial release on the condition that the defendant participate in a mental health or drug treatment program. The court may conclude

that a treatment program that focuses on rehabilitation (rather than incarceration) will help the defendant reintegrate into society and not recidivate while on pretrial release. But poorer defendants may be unable to pay for such programs, and public or court-funded programs are not always available. The defendant with financial resources to pay for treatment will be released from custody whereas the poor defendant may remain in custody. But this is neither an unlawful two-tiered system that favors the rich over the poor, nor a basis for denying pretrial release to the defendant who can pay for the treatment program.

Wealth impacts defendants in the criminal justice system in multiple other ways. The most obvious is the ability to exercise the constitutional right to retain private counsel of choice—who may be more experienced and skilled than appointed counsel, which may lead to better outcomes for wealthy defendants. *See Luis v. United States*, 578 U.S. 5, 34 (2016) (Thomas, J. concurring) (Under the Sixth Amendment, "'[a] defendant may not insist on representation by an attorney he cannot afford.' The Constitution perhaps guarantees only a 'freedom of counsel' akin to the First Amendment freedoms of speech and religion that also 'depen[d] in part on one's financial wherewithal.' Numerous laws make it more difficult for defendants to retain a lawyer. But that fact alone does not create a Sixth Amendment problem.") (internal citations omitted); *Ross v. Moffitt*, 417 U.S. 600, 616 (1974) ("This is not to say, of course, that a skilled lawyer…would not prove helpful to any

litigant able to employ him…[T]he fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process").

And wealthier defendants can also retain high-priced experts, private investigators, forensic specialists, and jury consultants to help them confront the government's case, gather evidence, and challenge the prosecution's evidence. Poorer defendants may not have access to the same resources, which may create a disparity in the quality of their defense or, worse, may result in innocent defendants pleading guilty. *See* Rakoff, J., *Why Innocent People Plead Guilty*, The New York Book Review (Nov. 20, 2014) (writing that "of 1,428 legally acknowledged exonerations, . . . about 10 percent . . . involved false guilty pleas. It is not difficult to perceive why this should be so. After all, the typical person accused of a crime combines a troubled past with limited resources: he thus recognizes that, even if he is innocent, his chances of mounting an effective defense at trial may be modest at best. If his lawyer can obtain a plea bargain that will reduce his likely time in prison, he may find it 'rational' to take the plea").[5]

---

[5] www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/

Through the long history of our criminal justice system, there have always been those who cannot afford the same conditions of bail as wealthier defendants and whose constitutional rights are guaranteed depending in part on their financial wherewithal. The release and security conditions proposed by the Alexanders do not create an unconstitutional two-tiered system of justice, as the District Court stated, or one that violates the Bail Reform Act. The conditions are authorized under the Act by placing the Alexanders in the custody of a qualified third-party custodian who can provide the required assurances, including appearance and community safety. To deny the Alexanders release because other defendants do not have the financial wherewithal to pay for a similar custodian would violate the Bail Reform Act and the Alexanders' right not to be subjected to excessive bail or cruel and usual punishment. As Judge Rakoff stated in *United States v. Dreier*, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) and later in *United States v. Weigand*, 492 F. Supp. 3d 317 (S.D.N.Y. 2020), there are conditions of bail that may favor the rich and that poor defendants cannot afford, but "equal protection works both ways. If defendants are to be treated similarly, without regard to wealth, then Weigand cannot be detained when an otherwise similarly situated indigent defendant would be released." *Weigand*, 492 F. Supp. 3d at 319.

### C. The District Court Denied Release Based on a Premise that is Fundamentally at Odds with the Excessive Bail Provision of the Eighth Amendment.

The Eighth Amendment's excessive bail provision is premised on the notion that "excessive" does not impose an absolute standard but rather a ***relative*** one. *See United States v. Brooks*, 872 F.3d 78 (2nd Cir. 2017) ("in light of the scope of the fraudulent scheme and wealth of Brooks, the amount of the bail security forfeited was not excessive"); *ODonnell v. Harris Cnty*., *Texas*, 251 F. Supp. 3d 1052, 1070 (S.D. Tex. 2017), *aff'd as modified*, 882 F.3d 528 (5th Cir. 2018), and *aff'd as modified sub nom*. *ODonnell v. Harris Cnty*., 892 F.3d 147 (5th Cir. 2018) (citing *Rex v. Bowes*, 99 Eng. Rep. 1327, 1329 (K.B. 1787) (per curiam) ("[e]xcessive bail is a relative term; it depends on the nature of the charge for which bail is required, upon the situation in life of the parties") & (Archbald, J.) (permitting a "lessening" of bail if there were "difficulty" procuring the decreed sum); and citing *Neal v. Spencer*, 88 Eng. Rep. 1305, 1305–06 (K.B. 1698) (collecting cases showing a diversity of bail amounts given for the same offense)). "Historians and jurists confirm that from the medieval period until the early American republic, *a bail bond was typically based on an individualized assessment* of what the arrestee or his surety could pay to assure appearance and secure release." *Id*. at 1069 (emphasis added) (noting that in medieval England, "[i]f an accused failed to appear, the sureties were 'amerced' with a fine, but there were 'maximum amercements

55

depending on the wrongdoer's rank; the baron [did] not have to pay more than a hundred pounds, nor the routier more than five shillings") (citing 2 Frederick William Polluck & Frederic William Maitland, *The History of English Law Before the Time of Edward I* 514 (2d. ed. 1984 [1898]) (alterations in original); *Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence *of that defendant*") (emphasis added). *Cf. United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (noting that the excessive fines inquiry is a relative one; "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of forfeiture must bear some relationship to the gravity of the offense that it is designed to punish").

The Excessive Bail clause of the Eighth Amendment is a ***shield*** that protects people of lesser means from being subjected to bails they cannot afford—and a bail that is "excessive" for one defendant may be entirely reasonable for another. The District Court in this case erred by transforming these Eighth Amendment protections into a ***sword*** by denying the Alexanders' proposed bail conditions even though those conditions would have ensured the safety of the community and the defendants' reappearance, which is all that the Bail Reform Act requires. *Cf. Boyle*, 342 U.S. at 4 (pre-Bail Reform Act case noting that "[f]rom the passage of the Judiciary Act of 1789, to the present . . . federal law has unequivocally provided that

a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction").

This governing premise of the bail provision of the Eighth Amendment requires that if bail is not excessive for the Alexanders, then the question of whether the same bail would be excessive for another defendant is not a basis to deny the Alexanders bail. What is of constitutional concern is the fundamental rights deprivation that occurred here, where the District Court denied bail to the Alexander brothers—not based on danger or risk of flight too great to be cabined by means of bail required by statute, but rather based on a concern that another defendant could not afford the same bail. Such a concern is foreign to the Bail Reform Act and turns the excessive bail provision of the Eighth Amendment on its head.

The Supreme Court in *United States v. Salerno* acknowledged that an "arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil." 481 U.S. 739, 754 (1987). And the Court noted that to "determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response." *Id*. Here, there was no valid governmental interest that the District Court protected by imposing a requirement that the only acceptable bail conditions for the Alexanders

are those that each and every defendant can afford through private resources (without donated assistance). This made the District Court's proposed response of detention excessive, because it was based solely on egalitarian concerns and not on any compelling government interest written into the bail statute or recognized by the Supreme Court in *Salerno*. Paradoxically, any conceivable interest that the District Court was seeking to protect is already protected by the relative nature of the excessive bail inquiry. If another defendant who, unlike the Alexanders, lacks assets to secure bond compliance, consideration of other alternatives for that defendant may be warranted. But denial of release to the Alexanders based on such a hypothesis is a violation of the guarantees of the Excessive Bail Clause. The District Court's reading thus improperly distorted that clause, denying the defendants constitutional protections under the Eighth Amendment. The District Court's decision should thus be reversed.

Principles of statutory construction dictate that statutes should not be interpreted in a manner that creates constitutional doubt. *See, e.g., United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.") (Holmes, J.). Here, the District Court's interpretation of the Bail Reform Act was premised on the theory that the defendants should be jailed rather than receive the constitutionally-premised access to terms of release

because they proposed a condition of release that not everyone can afford. This punishment (and its impact on trial preparation rights essential to defense of the case) was a novel and hence unusual one because it is linked to the Alexanders having access to greater wealth than other defendants who are pretrial detained. The District Court's interpretation of the law to bar use of a bail package that adequately addresses the concerns raised by the Bail Reform Act and the resulting punishment imposed thus creates constitutional doubt. None of these constitutional problems is written into the statute. The constitutional doubt canon thus provides separate grounds for reversal.

To the extent that *Boustani* holds otherwise, it was wrongly decided. The Alexander brothers proposed conditions of release that satisfied the statutory criteria, making it virtually impossible that they would flee or harm anyone. Their release to home confinement under the custody of a private security firm is expressly contemplated by the Bail Reform Act. 18 U.S.C. § 3142(c)(1)(B)(i). Denying their release violates the Bail Reform Act and the Eighth Amendment.

## II. The District Court Misapplied *Boustani* To Reject Out Of Hand The Private Security Measures Proposed By The Alexander Brothers Where The Brothers Were Detained Primarily Because Of Their Wealth.

The District Court held that *Boustani* precluded consideration of the Alexanders' proposed extensive bond conditions because private security promotes a two-tiered system of justice. A-517. This was clear error. This Court held in

*Boustani* that private security "may be appropriate where the defendant is deemed to be a flight risk primarily *because of* his wealth. In other words, a defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained." 932 F.3d at 82 (emphasis in original).

The procedural history of this case makes clear that the Alexanders were detained as a risk of flight primarily because of their wealth: "[BY AUSA]: I will now turn to risk of flight. Your Honor, the Defendants are multimillionaires who have access to resources to flee and live comfortably outside of the United States…." A-251. At every turn, the government argued that the Alexanders' "ample financial resources also create significant risk of non-appearance;" "all three defendants regularly fly on private jets;" "if the defendants wanted to flee, they have the means to do so quickly and without detection;" "the defendant is a multimillionaire who has the resources to flee and live comfortably in hiding;" "they also travel frequently outside the United States to other locations often booking flights at the last minute and traveling by their private jet or on a yacht;" "[t]urning next to the Defendant's significant wealth, this is a person with access to millions of dollars, private jets and yachts;" "[h]e has the kind of wealth that they can just decide any given day, in a matter of hours, we are headed off to this international location;" "[they are] defendants who have access to boats, who have access to significant resources, who have access to private jets, if they get on one of those vehicles between the time they leave their

property and the time that the FBI is able to find them, they are gone;" "[t]hat makes clear the depth of the resources that these Defendants have if they are prepared to flee;" "[the Alexander parents] have made clear that money is no object…there's absolutely every incentive here to flee;" "the defendants have the vast financial resources to ensure that if they chose to flee, they could do so quickly and without detection."

And the District Court acknowledged as much, stating during the detention hearing that "I did not interpret the government's position to be the risk of flight focuses on or rests on the defendants' wealth. I think their argument was, *because of their wealth*, they had the ability to make good on a desire to flee." A-407 (emphasis added).

To deny the Alexander brothers bail on the basis that their substantial wealth allows them to flee and resume their lives in a foreign country, while also prohibiting the brothers from using that wealth to pay for conditions that will ensure their appearance and the safety of the community, is fundamentally unfair and contrary to *Boustani*. If left uncorrected, the District Court's ruling creates an inequality against the Alexanders, who are being treated differently because of their wealth.

In a case decided post-*Boustani,* United States District Judge Rakoff approved home detention with private security for a wealthy defendant with greater foreign ties than the Alexander brothers and similarly facing exposure to a lengthy sentence. *Weigand*, 492 F. Supp. 3d at 317. The defendant in *Weigand* was a wealthy German citizen with minimal connections to the United States. He was charged with fraud

61

offenses carrying a 30-year maximum sentence. Like in this case, "[t]he [g]overnment, and [the district court]. . . repeatedly emphasized Weigand's wealth in explaining the risk of flight." *Id.* at 319. In initially ordering Weigand detained, Judge Rakoff relied on Weigand's "substantial personal wealth, giving him the means and wherewithal to flee the jurisdiction in spite of the usual obstacles such as having his passport confiscated or being electronically monitored." *Id.* at 319.

Weigand moved for reconsideration and presented a comprehensive bail package including a multi-million-dollar bond, home confinement, electronic monitoring, passport surrender, extradition waiver, and "24/7 surveillance by armed security guards retained at defendant's expense but authorized by the court to use reasonable force to prevent flight." *Id*. The government objected, arguing, as it does here, that *Boustani* foreclosed the private security condition. *Id*. at 319. Judge Rakoff rejected the government's argument because the government had "repeatedly emphasized Weigand's wealth in explaining the risk of flight," and held:

> [E]qual protection works both ways. If defendants are to be treated similarly, without regard to wealth, then Weigand cannot be detained when an otherwise similarly situated indigent defendant would be released. To that end, the Second Circuit recognized that a private security arrangement may be appropriate where the defendant is deemed to be a flight risk primarily because of his wealth.
>
> * * *
>
> [I]f Weigand can use his resources to ameliorate the risk of flight and reasonably assure his presence at trial, then the fundamental fairness principle identified in <u>Boustani</u>, as well as the Eighth Amendment and

62

> 18 U.S.C. § 3142(e), require his release. And the Court concludes that Weigand's proposed bail package does so.

*Id*.; *see also Dreier*, 596 F. Supp. 2d at 833 (Rakoff, J.) (granting private security condition and holding that although indigent defendants may have a more difficult time than those with means in "afford[ing] even the most modest of bail bonds or financial conditions of release," this "is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight"). As this Court held in *Esposito,* district courts are not precluded from imposing private security as a condition of release "when the defendant has substantial resources and such wealth contributes to his risk of flight." 749 F. App'x at 24.

To be sure, the District Court held that the Alexanders' "ties to other countries" was a basis for detention. A-519. But in making this determination, the Court overstated the brothers' foreign ties and understated their strong ties to the United States. The Alexander brothers' parents were born in Israel and naturalized as U.S. citizens in 1983, before their sons were born. Since emigrating here nearly one-half century ago, the parents started a family business and developed deep-rooted ties to South Florida. Both parents attended the University of Miami, repaying every dollar of student loans they obtained to finance their education. The Alexanders brothers' mother graduated with a bachelor's in computer science while working part-time as a Hebrew teacher to make ends meet.

The brothers are all United States citizens, born and raised in Miami; Alon and Oren are identical twins. The brothers attended high school in Miami. Alon obtained his college degree from the University of Maryland and his law degree from the New York Law School. He was admitted to the New York Bar in 2016. Alon met his wife Shani in 2018, they became engaged in 2019, and married in 2020. Shani served honorably in the Israeli military before moving to the United States where she has become a lawful permanent resident. With Shani, Alon has two infant daughters. Alon maintains a strong connection with his friends and family; they are active in their South Florida neighborhood and community.

Oren has strong ties to his community, including through his involvement and leadership in philanthropic events in Miami. He attended college in Colorado and graduated in three years. Oren arrived in New York in 2008 and built his business from the ground up. His wife is from Brazil but she left Brazil 15 years ago and is a lawful resident of the United States. Oren and his wife just had a baby boy.

Brother Tal is not married to a foreign national; yet at his detention hearing, the government argued that Tal was a risk of flight due to "[t]he fact that his parents are Israeli, the fact that he has traveled back to Israel, the fact that we have conferred with OIA and they have indicated that if he does flee there, which has happened in the past, that they are not going to be able to extradite him back and that is not a sure

thing." A-208; A-224. This argument would be repeated at Alon's later detention hearing in Miami. A-252.

The government's representations were inaccurate and unfairly overstated any potential risk of the Alexanders' flight to Israel. The mistaken belief that Israel will not extradite "one of their own" not only plays into "dual loyalty" tropes but is also inaccurate. *See United States v. Samet*, 11 F. App'x 21, 22 (2d Cir. 2001) (granting defendant's motion for remand to reconsider detention where "district court erroneously assumed that Israel does not extradite Israeli residents"); *United States v. Kresler*, 392 F. App'x 765, 768–69 (11th Cir. 2010) ("[T]he United States Attorney was under the mistaken belief that Israel would not extradite one of its citizens."); *United States v. Rosenstein*, 04-CR-21002, ECF#18 (S.D. Fla. April 12, 2006) (extradition of an Israeli citizen from Israel to the S.D. Fla); *United States v. Shai Cohen*, 16-CR-00114, ECF#9 (E.D. Va.) (documenting the extradition of an Israeli citizen charged with conspiracy to defraud, money laundering, and alien smuggling).

At the Alexanders' detention hearing in New York, after defense counsel raised these arguments, the government pivoted, this time reverting back to the Alexanders' wealth and claiming that "whether or not extradition is possible is, frankly, not the question." Instead, "[w]e're talking about the ability to go establish themselves — it could be in Israel, it could be in Brazil, they travel to the Caribbean by boat a lot. Like, their parents have property in the Bahamas, there's property in

Tel Aviv. And, so, all of these are places that are available to flee to." A-489. "What matters," the government continued, "is the ability to travel, the inclination to travel, the ability to pick up somewhere else and to reestablish the life there." A-490. The government did not explain how the Alexanders would be able to enter Israel without a passport (during a time of war, no less). It is also concerning to the extent that the District Court's ruling suggests that American children of immigrants, solely by virtue of their parents' birthplace, pose a greater risk of flight than those with American-born parents. First-generation Americans like the Alexanders (native-born residents with at least one foreign-born parent) comprise 12% of the U.S. population, or about 36 million people.[6]

In finding that these foreign ties created a risk of flight, the District Court improperly conflated an "*opportunity*" to flee with an "*inclination*" to flee, of which there was none. The brothers have substantial family and business ties in the United States and no history of flight. They do not hold citizenship in any other country, including Israel, and have not visited Israel in years. And perhaps most importantly, before their arrest in December 2024, the brothers had known of the criminal investigation that led to this indictment since July 8, 2024, when it was reported in the Wall Street Journal. Since that date, they made no attempt or plans to flee to Israel or Brazil or elsewhere.

---

[6] www.census.gov/content/dam/Census/library/publications/2016/demo/P23-214.pdf.

Supreme Court Justice Brennan has clarified that an *opportunity* to flee does not establish an *inclination* to flee. In his capacity as a Circuit Justice, Justice Brennan granted an application for bail pending appeal to a Vietnamese citizen convicted of espionage where there was no evidence of an inclination to flee. *Truong Dinh Hung v. United States,* 439 U.S. 1326 (1978). After Hung's conviction, the Fourth Circuit affirmed Hung's detention pending the appeal based on Hung's ongoing contact with the Vietnamese Ambassador in Paris; his lack of permanent residence in the United States; and the fact that, should he flee to Vietnam, the United States would have no means to procure his return. *Id*. at 1327. In advocating for Hung's detention, the government argued that Hung's parents and other close relatives still resided in Vietnam and therefore Hung's surrender of his Vietnamese passport or other travel documents would present no great obstacle to his flight. *Id*. at 1329 n.5.

Pointing to Hung's close ties to his community in the United States, Justice Brennan rejected these arguments and reinstated Hung's bail: "The question for my independent determination is thus whether the evidence justified the courts below in reasonably believing that there is a risk of applicant's flight. In making that determination, I am mindful that the command of the Eighth Amendment that excessive bail shall not be required at the very least obligates judges passing upon the right to bail to deny such relief only for the strongest of reasons. Given this

constitutional dimension, I have concluded that the reasons relied upon by the courts below do not constitute sufficient reason" to deny bail. *Id*. (cleaned up). Justice Brennan added: "[I]f these considerations suggest *opportunities for flight, they hardly establish any inclination on the part of applicant to flee.* And other evidence supports the inference that he is not so inclined." *Id.* at 1329.

Like in *Hung,* courts in this Circuit and others have granted pretrial release to defendants with much stronger foreign ties than the Alexanders. *See United States v. Elias*, 18-CR-419 (S.D.N.Y.), ECF#30 (releasing Brazilian national with significant financial means to home incarceration in a rental apartment in Manhattan); *United States v. Hansen*, 108 F. App'x 331, 332 (6th Cir. 2004) (releasing Danish defendant despite government's inability to extradite from Denmark); *United States v. Bodmer*, 2004 WL 169790, at *2 ("The Government further argues that Bodmer has a strong incentive to flee because pursuant to Swiss law, the Swiss government will not extradite Swiss nationals. Even if this is so, this argument alone cannot be a basis for denying bail because if taken to its logical conclusion, no Swiss national would ever be eligible for bail"); *United States v. Khashoggi*, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989) (granting bail to an "enormously wealthy" Saudi Arabian in fraud case, despite the fact that there was no extradition treaty in place); *United States v. Seng*, 15-CR-706 (S.D.N.Y.), ECF#53 (releasing Chinese national to home confinement secured by private

68

security firm even though China does not extradite its citizens); *United States v. Flotron*, 17-CR-220 (D. Conn.), ECF#10 (releasing Swiss national charged with fraud in the District of Connecticut, pursuant to a bail package that included home confinement in his girlfriend's home in the District of New Jersey, GPS monitoring, and a personal recognizance bond secured by approximately $3 million in assets); *United States v. Ming Fan*, 13-CR-52 (S.D.N.Y. January 25, 2013), ECF#7 (releasing wealthy Taiwanese national who resided in Singapore despite the fact that defendant had not visited the U.S. in 16 years prior to the trip during which he was arrested for accounting fraud; defendant bought an apartment in New York in which to stay during the period of his release); *United Stales v. Nejad*, 18-CR- 224 (S.D.N.Y.), ECF#31 (releasing Iranian citizen charged with sanctions violations and whose father was said to be wealthiest businessman in Iran); *United States v. Karni*, 298 F. Supp. 2d 129, 132-33 (D.D.C. 2004) (releasing Israeli national and resident of South Africa to the custody of a rabbi who must commit to have someone with Defendant on a twenty-four hour basis, seven days a week; defendant lacked ties to the United States and there was no evidence he had ever lived in this country, owned property here, or that he had any family or community ties in the United States); *United States v. Motamedi*, 767 F.2d 1403, 1407-08 (9th Cir. 1985) (overturning detention order of Iranian citizen "allegedly acting as an agent of the Iranian government who could return to Iran with impunity").

Unlike all these defendants, the Alexander brothers are United States citizens with deep ties to their South Florida community; their foreign ties are similar in nature to the ties of millions of Americans and do not establish an inclination to flee.

Finally, the District Court erred by failing to consider whether the proposed bail package would be effective in reasonably assuring the Alexanders' appearance at trial. First, the private security measures proposed by the Alexander brothers were appropriate under *Boustani* and would have virtually assured appearance and community safety. Second, the Alexanders proposed several other substantial conditions of bond to be imposed upon them and their unindicted family members that eliminate the risks identified by the District Court, including the posting of a bond *in any dollar amount,* co-signed by the Alexander parents and secured by the entirety of the family's wealth and assets. A-43. The brothers also proposed surrendering their passports and the passports of their parents, wives, and children; execution of waivers of extradition, home confinement, GPS monitoring, video surveillance, wiretap of phones and computers, and authorization for the government to search the location of home confinement at any time to ensure compliance with bail conditions. *Id*. Additionally, in response to the Court's concern that "[t]heir parents own substantial real estate in a foreign country," the Alexander parents offered to sell that property and deposit the proceeds in the court registry. A-455-456 (by Alon's counsel: "if the Court's concerned that they have a piece of property in

Israel, which we disclosed, an investment property in the Bahamas, we can sell those now and deposit the money in a registry of the Court, if that's the concern. We'll do anything we need to give the Court the comfort that the boys are not going to flee and leave their parents, their uncle, penniless. That's the evaluation you need to make").

And yet, the District Court failed to provide *any* explanation as to why these conditions were insufficient to either protect the community or reasonably assure the Alexanders' appearance at trial. The government likewise failed to do so, short of fanciful theories of evading Israel's "Iron Dome" via private jet. But Second Circuit precedent requires that, in order to satisfy its burden of proving that "no conditions" exist that will reasonably assure the defendant's presence, the government *must* articulate, with *specificity and credible evidence*, how it is that the defendant could manage to flee under the proposed bail conditions. *United States v. Madoff,* 586 F. Supp. 2d 240, 249 (S.D.N.Y. 2009) ("assertion" by prosecutor that there "remains some risk of flight" is insufficient; the government must "articulate [the] flaw" in the proposed conditions). Speculation is not permitted—yet here, the District Court's decision relied on nothing more. *See Bodmer*, 2004 WL 169790, at *3 (where government's argument that no conditions could assure defendant's future presence was based, "in large part, on speculation," defendant was released to home confinement with GPS monitoring). The District Court failed to fulfill its "obligation

71

to consider all possible alternatives to preventive detention," *United States v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986), focusing only on—and outright rejecting—the Alexanders' private security proposal. This failure mandates reversal. *Id.* (reversible error where district court "fail[ed] to explain on the record" how the government "had shown that no conditions" would assure the defendant's appearance); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (detention order will not be upheld where the district court made conclusory or "implied" findings).

The Bail Reform Act does not require that the risk of flight be zero, only that the conditions imposed 'reasonably assure' appearance. 18 U.S.C. § 3142(e)(1); *United States v. Aiston*, 420 F.2d 176, 178 (D.C. Cir. 1969) (bail statute "does not demand absolute certainty, which would be only a disguised way of compelling commitment in advance of trial"). And "reasonably assure" does not mean conditions that will "guarantee" the defendant's presence. *See, e.g., Madoff*, 586 F. Supp. 2d at 249.

In *United States v. Fox*, discussed more substantively below, United States District Judge Vilardo revoked the magistrate judge's order of detention, writing, "Noticeably absent from the government's brief is any explanation of how the numerous proposed conditions would not mitigate any potential risk of danger or flight. Nor was the government able to convincingly answer that question at oral

72

argument." 602 F. Supp. at 441. Instead, at oral argument, the government "implored [the court] to ask 'what if?'" Judge Vilardo rejected this argument, reasoning:

> To be sure, that is a powerful question and one that haunts this Court in every case in which it must decide whether an individual accused of a crime should be released. But it is not the question that the law requires this Court to ask—and with good reason. If "what if" were the proper inquiry, *virtually no one indicted for a serious crime would ever go free.* And that would undermine the constitutional pillar that one is assumed innocent until proven guilty.

*Id*. at 443 (emphasis added).

And here, the question of "what if" is answered by the release conditions proposed by the Alexanders. Those conditions are even more onerous than the conditions approved by this Court in *Sabhnani*, where the defendants were naturalized American citizens from Indonesia and India and were charged with using violent means to enslave illegal immigrants. 493 F.3d at 65. This Court found that the defendants, who had "significant wealth," had a strong motive to flee the United States because "evidence of their guilt was compelling" and they faced a statutory maximum of 40 years of imprisonment. *Id*. at 66-67. In addition to their "vast financial resources," the defendants had "personal and professional contacts with numerous foreign countries" and had conducted wire transfers exceeding $17 million with at least three countries "with which the United States did not have extradition treaties." *Id*. at 67. The primary issue on appeal was the sufficiency of the proposed conditions of release which included a significant monetary bond, home detention, electronic

monitoring, and 24-hour electronic monitoring of the defendants' residence by a private investigation firm (with the expense born by defendants).

In reversing the detention order, this Court found that the government had not shown that the proposed conditions, as amended, were insufficient, *even assuming* "that defendants possess a strong motive to flee" due to the serious nature of the crimes charged (which "allegedly involved violence"), the strength of the evidence, and the likelihood of lengthy prison terms if the Sabhnanis were convicted. *Id.* at 76. This Court likewise acknowledged that the Sabhnanis had ties to foreign countries and "ample means to finance flight" for their entire family. *Id.* at 77. But the Court found that the "extraordinary" security measures, proposed by the government and agreed to by defendants, were strong enough to rebut any reasonable concern about flight. *Id.* Based on these conditions, this Court vacated the detention order.

The Court should make the same finding here. The conditions proposed by the Alexanders are similarly "extraordinary." Home confinement supervised by private security is an appropriate condition of release under *Boustani* and pursuant to equal protection and Eighth Amendment considerations as articulated by Judge Rakoff, and should have been considered by the District Court. Such a condition, coupled with the family's pledge of the entirety of their wealth, which if forfeited would leave the entire Alexander family destitute, will more than reasonably assure the Alexander's appearance in the District Court and the safety of the community.

74

**III. The District Court Erred By Detaining The Alexander Brothers As Posing A Future Danger To The Community, And In Any Event The Security Measures Proposed By The Alexanders Alleviate Any Perceived Danger.**

Two Magistrate Judges held detention hearings in this case, and both found that conditions of release could be fashioned to address community safety. A-229 (Magistrate Judge Reid: "With respect to danger to the community, I will find that there are conditions and some combination of conditions that could alleviate the danger to the community. So that is not my area of concern"); A-383 (Magistrate Judge Sanchez: "I do think that there is dangerousness here, [but] I think that conditions could be fashioned, a combination of conditions, to address any type of danger that is presented here").

The District Court overruled both findings without receiving any evidence or testimony, basing its findings solely on the government's proffer of historical conduct alleged to have occurred years ago. The court did not identify any facts that establish future dangerousness, finding instead that the evidence of past wrongdoing is strong: "[THE COURT:] There is no question that the government has shown, by clear and convincing evidence, that these defendants pose a risk to the community. The government has proffered that over many years, they have sexually assaulted women. The nature and circumstances of that offense weigh in favor of a finding of dangerousness…The weight of the evidence is strong...In short, the evidence against them is strong." A-517-518.

This was insufficient. "In enacting the Bail Reform Act of 1984, Congress substantially altered the preceding practice under which assurance of the defendant's presence at trial was the only factor to be considered in detention determinations before trial." *United States v. Traitz*, 807 F.2d 322, 325 (3d Cir. 1986) (citing S. Rep. No. 225, 98th Cong., 2d Sess. 5, *reprinted in* 1984 U.S. Code Cong. & Admin News at 3187). In broadening the bases for pretrial detention to include dangerousness, Congress made clear that the expansion applied only to the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." S. Rep. No. 225, 98th Cong., 2d. Sess. at 607, *reprinted in* 1984 U.S. Code Cong. & Admin. News at 3189; *see also Salerno*, 481 U.S. at 751 (rejecting facial challenge to Bail Reform Act given its narrow focus on cases where government "musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community").

There is a rebuttable presumption in this case "that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(D). "[W]here there is such a presumption, the defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with

76

evidence that he does not pose a danger to the community or a risk of flight." *United States v. English,* 629 F.3d 311, 319 (2d Cir. 2011) (internal citations omitted). The government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant poses a serious risk of committing a crime *in the future* while on pretrial release. *See United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *Fox*, 602 F. Supp. 3d at 440.

Clear and convincing evidence "produces in the mind . . . a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *United States v. Mercado*, No. 24-MJ-561-MJP, 2024 WL 3082704, at *2 (W.D.N.Y. June 20, 2024) (quoting *Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 358 (S.D.N.Y. 2014).

The court's analysis of danger to the community is forward-looking: the district court must weigh the evidence and consider "the future—not just the past." *United States v. McGill*, No. 24-MJ-609-MJP, 2024 WL 4647613, at *10 (W.D.N.Y. Nov. 1, 2024); *Madoff,* 586 F. Supp. 2d at 250 ("to be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs to show that there is a serious risk that these potential harms exist going forward").

**A. The Years-Old Historical Allegations the Court Relied Upon Do Not Establish Future Danger.**

The government's burden was to demonstrate by direct, weighty, and convincing evidence, that it was highly probable that the Alexander brothers would commit new crimes while on pretrial release. No such proof was presented to the District Court, as the government could only point to allegations of historical conduct. The Alexander brothers, on the other hand, presented evidence and testimony that rebutted the presumption and showed that in the years since any unlawful conduct allegedly occurred, the Alexanders have all married, had children, and led lives very different than what is portrayed in the Indictment. A-458. The evidence showed that there are no allegations that the brothers were involved in any alleged misconduct after 2021 (Oren), 2020 (Tal), and 2018 (Alon). A-476-477.

Courts in this district have declined to detain defendants as a danger to the community where there was a passage of time with no allegations of recent wrongdoing by the defendant. For example, in *Fox*, this Court affirmed the lower court's ruling that there were conditions of release that could mitigate any danger that Fox, charged with egregious allegations of sexual misconduct in addition to firearm and drug offenses, posed to the community. 602 F. Supp. 3d at 442. Evoking the words of Justice Harlan in *United States v. Clark*, 96 U.S. 37, 49 (1877) (Harlan, J., dissenting), the district court presiding over Fox's detention hearing emphasized

the importance of setting aside personal aversions and adhering to the relevant legal standard, especially in cases involving difficult accusations:

> It is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law. This is precisely the type of hard case that can tempt a court to be guided by emotion rather than the relevant legal principles…
>
> The defendant is charged with trading drugs for sex that included violence. The images and communications presented by the government have substantial shock value, and the allegations are deeply disturbing. The Court is duty-bound, however, to cast aside visceral reactions and personal opinions and to focus instead on the only questions that matter in the context of the government's motion for detention.

602 F. Supp. 3d at 436.

A Magistrate Judge detained Fox based on risk of flight and danger to the community. On appeal to the district court, Fox, who was indicted in 2022, argued that the misconduct attributed to him was "all historical" in that he had not patronized any escorts for two years, since 2020, and had not kept drugs in his home since 2021, and therefore he did not pose a danger to the community. *Id*. The government had been monitoring Fox from December 2021 to February 2022 but uncovered no drug activity, no escort activity, and no illegality of any kind. *Id*. In turn, the government pointed to illicit internet searches for escorts and text messages with escorts in 2022, and a jail call between Fox and his girlfriend in 2022, to show that Fox's misconduct was not "in the rear-view mirror." *Id*.

The district court found that "with respect to danger, other than repeatedly referencing Fox's sex addiction, the government provided no reason to believe that Fox would jeopardize his freedom by engaging in illegal activity while being closely monitored. Nor has the government presented any evidence of recent drug activity." 602 F. Supp. 3d at 436. The court also noted that "[n]one of the searches suggest that Fox was or is contemplating non-consensual sex. Moreover, there is no evidence that Fox actually engaged in any commercial sex act after 2020. That he was conducting internet searches is not enough to show that he intended to follow through." *Id*. Ultimately, the court held it "simply cannot find with the required 'high degree of certainty' that Fox will engage in any drug activity or solicitation of escorts while" subject to onerous conditions of pre-trial release. *Id*. at 423. On the government's appeal, this Court affirmed, rejecting the government's argument "which rest[ed] on the notion that, in effect, Fox has an uncontrollable sexual addiction that will compel him to reoffend if released pending trial no matter the consequences" because it was unsupported by any of the government's evidence. *Fox*, 2022 WL 2564600, at *2-3.

*United States v. McGill* is also instructive. McGill was charged with using encrypted social media to distribute fentanyl, methamphetamine, and other narcotics. 2024 WL 4647613, at *1. The government proffered that McGill had also purchased a gun to facilitate his drug trafficking, and proffered McGill's profile

80

photo on the social media platform, showing the gun. *Id*. at *2. The government proffered that McGill had trafficked "an astonishing amount of drugs" over a span of three years, including "hundreds of thousands" of fentanyl pills. *Id.* at *3.

The government sought detention, arguing that McGill was a danger and a flight risk. *Id*. The court found that while "the government's evidence is ironclad," "there is more to the Bail Reform Act than considering the past dangers of McGill's drug dealing" and the court "would commit legal error if [it] looked only to the past." *Id.* at *7. The court held there was "not a strong probability" that McGill would commit additional crimes while on release, because "the government has no data points to show that McGill has even 'returned to criminal behavior once free from parole or probation.'" *Id.* Ultimately, the court held, "I am at a loss about how I can find with the required high degree of certainty that Defendant poses a danger especially given his spotless criminal record and when I intend to subject him to stringent conditions of release." *Id*. (citing *Fox*, 602 F. Supp. 3d at 443) (internal quotations omitted).

As in *Fox* and *McGill*, there has been a significant passage of time in this case since the allegations in the indictment. Nearly seven years have passed since the misconduct alleged against Alon, five years with respect to Tal, and three as to Oren. The District Court's statement that she was "not as sanguine as the defense is, . . . that…[the Alexanders] have changed their stripes," was based on nothing more than

81

the court's feelings, as there was no evidence and no testimony to support it. To the contrary, because the allegations against the Alexanders were from years past and there was no evidence of recent misconduct, the record established that the community has been safe for many years leading up to the Alexanders' arrest. No countervailing evidence or testimony was offered by the government that would establish that despite the Alexanders' law-abiding conduct in the past years, any one of them would decide to now commit new crimes while on pretrial release and forfeit a bond that would cause their parents, as well as the brothers and their wives and children, to become destitute. And some of the government's arguments on danger were wholly disconnected from reality. For example, in Tal's detention hearing, the government argued that if Tal was released to home confinement, Tal would rape the women staff working at the home and he would use a cell phone to lure additional unknown other women to the home and rape them too. A-221-222. Magistrate Judge Reid correctly rejected this argument and detained Tal on risk of flight only. A-229-230, A-24.

Other than weighing the historical allegations against the Alexander brothers, the District Court made no factual findings that the Alexander brothers fall into the limited class of particularly dangerous offenders for whom no combination of conditions can ensure the future safety of the community. As Judge Vilardo wrote in *Fox*, the District Court was "duty bound…to cast aside visceral reactions and

personal opinions and to focus instead" on the evidence presented. In this case, the court failed to do so.

## B. The District Court Overstated the Strength of the Government's Case.

In *United States v. Zhang*, this Court held that "a preliminary assessment of the strength or the weakness of the evidence can be a key consideration in whether the defendant is dangerous or poses a flight risk, and such a finding does not in fact impinge upon the presumption of innocence." 55 F. 4th 141, 152 (2d Cir. 2022). The District Court concluded that the government's evidence is strong. But the Alexander brothers presented compelling evidence that the government's case is weak, based on years-old allegations that were either not reported to law enforcement or deemed not chargeable at the time they occurred; text messages that do not correspond with the specific acts alleged in the indictment; conflicting allegations; and agents' hearsay testimony about accusers' accounts of these years-old events. The Court also failed to consider fundamental legal deficiencies in the government's novel theory of sex trafficking.

### i. *The factual basis for the charges is weak.*

The government's proffer relied almost exclusively on accounts of years-old sexual assaults and a claim, based on multiple interviews, that the Alexanders ran a "playbook" to carry out their conspiracy under which they drugged and raped unsuspecting women. A-473. The District Court wrongly credited this unsupported

proffer and the credibility of these accusers, while ignoring significant weaknesses in the government's case.

The evidence is particularly weak as to Alon, who in 2018 publicly declared his engagement to his wife—and for whom the alleged conduct thus falls outside the statute of limitations for the 18 U.S.C. § 1594 conspiracy count charged in Count 1. *See* 18 U.S.C. § 3282(a), and *cf.* 18 U.S.C. § 3299 (listing section 1591, but *not* section 1594, as those statutes to which a statute of limitations does not apply). As for the weight of the evidence supporting the § 1591 offense charged in Count 3, the sole substantive count in which Alon is mentioned, the government does not allege that Alon engaged in any sexual activity. Additionally, the FBI agent who testified at the detention hearing in Florida conceded that after the alleged sexual assault of Victim 2, Victim 2 and her friend partied in the Hamptons with the Alexander brothers for the remainder of the weekend. A-269-270. Victim 2 claims that she told her friend about the assault that weekend, but the friend continued to maintain social interaction with the Alexander brothers, as documented in a photograph of her months later in Miami Beach socializing with Oren. All this evidence undermines the strength of the government's allegations against Alon. *See* A-529.

None of the accusers testified at any of the detention hearings and there is zero physical evidence of any assaults. The government admitted it has no forensic evidence, biological evidence, toxicology reports, and no blood tests showing the presence of

drugs. A-485-86. And while the government proffered that two videos were found in Tal's apartment that allegedly reflect sex acts with women who appear to be intoxicated, by the government's own account, these videos are from 2009 and 2013, and the government conceded that it had not interviewed the woman in the 2009 video. A-420-421, A-473. Without exception, the women either never reported the alleged assaults at the time, or law enforcement decided the allegations were not credible.

There is also ample evidence impeaching the credibility of the women who have sued the Alexander brothers. For example, one accuser, KW, messaged Oren Alexander saying "sexy . . . u were so *fkable* tonight," one month before the alleged assault. A-546 (emphasis added). One month after the alleged assault, KW messaged Oren again, this time asking if she could bring her friends from Australia to Oren's birthday party, writing "they are lovely." A-543. And in the year after the alleged assault, KW sent multiple scandalous very sexually explicit and inviting text messages and images to Oren and Alon, describing in detail the sex acts she was fantasizing about doing to them. A-546-551.

Another accuser, AP, has brought at least two other actions accusing individuals of sexual misconduct. One of those cases was dismissed with a judicial finding that sanctions would be imposed "on the plaintiff and her attorney for bringing the aforementioned causes of action because they are completely without merit in law and were undertaken primarily to harass or maliciously injure the defendant and as a policy,

frivolous and baseless causes of action will not be tolerated by the Court." A-552-53; *see also* Dismissal Order*, Cecora v De La Hoya*, 0112787/2011 (N.Y. Cty. Mar. 30, 2012). The second case revealed that this accuser had worked with a man who "has a history of extorting rich men by engaging in sexual acts with them." A-423-424.

A third plaintiff, RW, messaged Oren to meet less than two weeks after the alleged assault occurred. A-558.

At his detention hearing, Tal showed that Victim 1 in the indictment was "quoted in the New York Times last year saying, I have no idea what happened." A-416. Another accuser sent "provocative invitations" and "sexually explicit[] photographs" to one of the defendants in the year and a half after the alleged assault, which she "never reported . . . to law enforcement." A-421-22. Twelve years later, she "sue[d] Oren and Alon Alexander, and the only eyewitness to this alleged rape denies that it ever happened." A-422. Another accuser, "after having sex with Oren Alexander, invited him to an event with her parents at her parents' home." A-423. It was only a decade later, "after reading about a flurry of lawsuits," that she filed a lawsuit claiming for the first time that she had been raped. *Id.*

The District Court also did not properly consider that many accusers have filed civil lawsuits against one or more of the Alexander brothers, which shows a significant financial motive to fabricate allegations against them. A-512; *see* Pattern Crim. Jury Instr. 11th Cir. BI B5 (2024) ("To decide whether you believe any witness

I suggest that you ask yourself a few questions…Did the witness have a personal interest in the outcome of the case?... Did the witness have any particular reason not to tell the truth?"). And all the accusers whose identities are known to the Alexanders present significant credibility issues. *See* A-416-17; A-420-425. But the District Court appeared dismissive of these arguments, stating instead that "if the facts are as the defendants say, this is going to be a fascinating trial to watch." A-519. In fact, in response to counsel's argument that there is a "financial motive" for the accusers, the District Court admonished defense counsel, telling him "this argument is beneath you." A-512-513. The court's reaction gave the impression that the Alexanders' arguments were being summarily dismissed rather than given due weight. A-513.

Finally, the Court also erred by rejecting as a supposed media stunt the fact that post indictment, Alon and Oren sat for polygraph examinations performed by a highly qualified retired FBI agent, answered questions about the charges against them, and passed the examinations. The court dismissed the results, accusing counsel that counsel wanted the polygraphs for the media. A-425.

Courts in the Second Circuit have considered polygraphs in pre-trial and post-trial proceedings. Specifically, in ruling on the bail application in *Fox,* the district court considered that Fox had "passed a polygraph in which he was asked several times whether he had ever had non-consensual sex with anyone and answered 'no'" in determining the weight of the evidence against Fox in his detention proceedings.

87

602 F. Supp. 3d at 441. And in *United States v. Johnson*, the Second Circuit affirmed the requirement of sex-offender treatment using polygraph testing as a permissible condition of supervised release, because the "polygraph can help penetrate deception and encourage an offender to confront his own motivations and behaviors." 446 F.3d 272, 278 (2d Cir. 2006). This Court noted that "the exclusion of polygraph evidence in many cases has been based in part on a risk of prejudicial effect." *United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995). But "prejudice is not as salient a risk in the absence of a jury; generally speaking, sentencing judges are better equipped to decide what weight if any to afford polygraph results." *Id*.

The District Court's finding on danger is erroneous as it failed to give proper weight to all the evidence presented.

*ii. The legal basis for the charges is insufficient.*

The Court also disregarded significant weaknesses in the government's novel theory of sex trafficking, undermining the Court's finding that "the weight of the evidence is strong." A-517. The Indictment only charges two substantive sex trafficking counts: Count 2 against Tal and Count 3 against Oren and Alon. Count 1 is a § 1594 conspiracy count. The substantive sex trafficking counts, as described by the government, do not adequately allege a commercial sex act nor do they adequately allege "anything of value" that the Alexanders received in exchange for the commercial sex act, as required by statute.

88

As for the commercial sex act element, the government proffered allegations of the defendants "lur[ing] the victims" and "buy[ing] flights," referencing facially noncriminal activity. To the extent that the government argued the defendants in some way portrayed themselves as appealing dates who would throw appealing parties, that would not establish a sex trafficking conspiracy. From the government's proffer, the government alleges women chose to attend on the understanding that they were going to party with the Alexander brothers—whom they met on dating apps or social media. There is no allegation that such social meetings would be equivalent to luring women under false promises of employment, which is not charged here. The government also misuses the term "procuring" to describe conduct that is consistent with scheduling a date and is entirely inconsistent with sex trafficking. The allegation itself is social, not commercial, activity.

And, as this Court has held, 18 U.S.C. § 1591(e)(3) "require[s] a causal connection between the sexual act and the giving or receiving of anything of value." *United States v. Raniere*, 55 F.4th 354, 365 (2d Cir. 2022) (causal connection satisfied where defendant gave non-monetary benefits to "masters" within the criminal organization defendant operated in exchange for the "masters" continuously sexually assaulting the victims). Yet the District Court failed to consider the attenuated nature of the causal connection here. No victim is alleged to have received a thing of value in

exchange for an alleged coerced sexual act.[7] The government asserts that the defendants invited the accusers to luxury locations and then forcibly raped them, and has conceded that proving a "commercial sex act" is a significant issue in the case—noting that it will be grounds for an "expect[ed] . . . motion to dismiss." A-487.

The conspiracy count suffers similar deficiencies. 18 U.S.C. § 1594 punishes anyone who "conspires"—that is, purposefully enters into an agreement to do something unlawful—"to violate section 1591." At the detention hearing for Alon in Florida, the government claimed the brothers had an "explicit agreement . . . to orgy." A-322. That is not an agreement to do something unlawful. The Superseding Indictment's conspiracy section is bare-bones and scattershot. It does not allege a manner and means; it does not identify specific roles by members of the conspiracy; and it does not identify any overt acts.

Legally and factually, this case is hardly the slam dunk portrayed by the government and the District Court, and the government's proffer in itself cannot sustain a finding of dangerousness in light of the evidence presented by the Alexanders.

---

[7] The government's theory is also antithetical to the legislative history of 18 U.S.C. § 1591, which "is part of a comprehensive regulatory scheme that criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain." *United States v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015). Congress enacted this statute to redress sexual exploitation for profit, and not merely the mistreatment of women and children. *See* 22 U.S.C. § 7101(2) & (8).

## **CONCLUSION**

For the foregoing reasons, the Court should reverse the District Court and remand with instructions to grant the Alexander brothers release pretrial under suitable conditions.

Dated: April 10, 2025

RICHARD C. KLUGH
LAW OFFICE OF RICHARD C. KLUGH
*Attorney for Defendant-Appellant*
  *Oren Alexander*
40 NW 3rd Street, PH1
Miami, Florida 33128
(305) 903-6900

/s/Howard M. Srebnick
HOWARD M. SREBNICK
JACKIE PERCZEK
ALEXA KLEIN
JEANELLE GOMEZ
BLACK SREBNICK
*Attorneys for Defendant-*
  *Appellant Alon Alexander*
201 South Biscayne
Boulevard, Suite 1300
Miami, Florida 33131
(305) 371-6421

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief contains 23,558 words. On April 10, 2025, Appellants Alon and Oren Alexander moved without objection to file one consolidated brief not to exceed 26,000 words, consistent with Local Rule 32.1 (a)(4)(A) which provides that the principal brief of each appellant must not exceed 14,000 words. A ruling on the unopposed motion is pending.