# 25-222(L)

**25-223(CON), 25-224(CON)**   *To Be Argued By*:
KAIYA ARROYO

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

**Docket Nos. 25-222(L), 25-223(CON), 25-224(CON)**

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ALON ALEXANDER, OREN ALEXANDER, TAL ALEXANDER,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

JAY CLAYTON,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

KAIYA ARROYO,
ELISABETH ESPINOSA,
ANDREW JONES,
NATHAN REHN,
   *Assistant United States Attorneys,
   Of Counsel*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The Offense Conduct and Evidence . . . . . . . . 3

    B.  The Florida Bail Proceedings . . . . . . . . . . . . 6

    C.  The District Court Bail Hearing . . . . . . . . . 9

ARGUMENT:

POINT I—The Defendants' Arguments About Private
    Security Are Foreclosed by *Boustani*'s Holding
    that the Bail Reform Act Does Not Permit Self-
    funded Private Jails Except in Circumstances
    Not Present Here . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 13

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.  There Was No Plain Error in Judge
            Caproni's Decision to Follow This Court's
            Binding Precedent . . . . . . . . . . . . . . . . . . 15

        2.  The Defendants' Arguments that
            *Boustani* Was Wrongly Decided Are
            Meritless. . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT II—Judge Caproni Did Not Clearly Err in
    Denying the Defendants Bail . . . . . . . . . . . . . . . 22

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 22

ii

PAGE

   B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       1.  Judge Caproni Did Not Clearly Err in Finding the Defendants Are Dangers to the Community . . . . . . . . . . . . . . . . . . 25

       2.  Judge Caproni Did Not Clearly Err in Finding the Defendants Are Flight Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       3.  Judge Caproni Did Not Clearly Err in Finding the Defendants' Private Jail Proposal Violated the Bail Reform Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

*Cases*:

*Anderson v. Bessemer City*,
   470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . . . . . . . 28

*Ardolf v. Weber*,
   332 F.R.D. 467 (S.D.N.Y. 2019) . . . . . . . . . . . . . 29

*Carroll v. Trump*,
   124 F.4th 140 (2d Cir. 2024) . . . . . . . . . . . . . . . . 27

*United States v. Akhavan*,
   523 F. Supp. 443 (S.D.N.Y. 2021) . . . . . . . . . . . . 20

iii

PAGE

*United States v. Banki*,
   369 F. App'x 152 (2d Cir. 2010) . . . . . . . . . . . . . 18

*United States v. Boustani*,
   932 F.3d 79 (2d Cir. 2019) . . . . . . . . . . . . . *passim*

*United States v. Dawkins*,
   999 F.3d 767 (2d Cir. 2021) . . . . . . . . . . . . . . . . 30

*United States v. Dermen*,
   779 Fed. App'x 497 (10th Cir. 2019) . . . . . . . . . . 18

*United States v. English*,
   629 F.3d 311 (2d Cir. 2011) . . . . . . . . . . . . . . . . 24

*United States v. Epstein*,
   425 F. Supp. 3d 306 (S.D.N.Y. 2019) . . . . . . . . . . 25

*United States v. Ferranti*,
   66 F.3d 540 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 23

*United States v. Fox*,
   602 F. Supp. 3d 434 (W.D.N.Y. 2022) . . . . . . . . . 28

*United States v. Fox*,
   No. 22-1043, 2022 WL 2564600
   (2d Cir. July 8, 2022) . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Khusanov*,
   731 Fed. App'x 19 (2d Cir. 2018) . . . . . . . . . . . . 23

*United States v. LaFontaine*,
   210 F.3d 125 (2d Cir. 2000) . . . . . . . . . . . . . . 24, 26

*United States v. Maxwell*,
   510 F. Supp. 3d 165 (S.D.N.Y. 2020) . . . . . . . . . . 33

iv

PAGE

*United States v. McDuffie,*
    451 F. Supp. 3d 281 (S.D.N.Y 2020) . . . . . . . . . . 17

*United States v. Mendonca,*
    88 F.4th 144 (2d Cir. 2023) . . . . . . . . . . . . . . . . . 15

*United States v. Mercedes,*
    254 F.3d 433 (2d Cir. 2001) . . . . . . . . . . . . . . . . 23

*United States v. Peguero,*
    34 F.4th 143 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 16

*United States v. Raniere,*
    55 F.4th 354 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 29

*United States v. Rodriguez,*
    950 F.2d 85 (2d Cir. 1991) . . . . . . . . . . . . . . . . . 23

*United States v. Sabhnani,*
    493 F.3d 63 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 18

*United States v. Salerno,*
    481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Stephens,*
    447 F. Supp. 3d 63 (S.D.N.Y. 2020) . . . . . . . . . . 17

*United States v. Watkins,*
    940 F.3d 152 (2d Cir. 2019) . . . . . . . . . . . . . . . . 24

*United States v. Weigand,*
    492 F. Supp. 3d 317 (S.D.N.Y. 2020) . . . 19, 20, 22

*United States v. Whab,*
    355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . . 16

v

PAGE

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 1591(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . 29

18 U.S.C. § 3142(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 3142(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3142(e)(3)(D) . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3142(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3142(g) . . . . . . . . . . . . . . . . . . . . . . . 24, 33

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . . . . . . . . 15

Federal Rule of Criminal Procedure 5(c)(3) . . . . . . . . 3

# 𝖀𝖓𝖎𝖙𝖊𝖉 𝖘𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## FOR THE SECOND CIRCUIT

## Docket Nos. 25-222(L), 25-223(CON), 25-224(CON)

———————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ALON ALEXANDER, OREN ALEXANDER, TAL ALEXANDER,

*Defendants-Appellants.*

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————————

### Preliminary Statement

Alon Alexander and Oren Alexander (the "Defendants") appeal from an order denying pre-trial release that was entered in the United States District Court for the Southern District of New York on January 15, 2025, by the Honorable Valerie E. Caproni, United States District Judge.

Superseding Indictment S1 24 Cr. 676 (VEC) (the "Indictment") was filed on December 11, 2024. The Indictment charged three counts. Count One charged the Defendants and their brother Tal Alexander with participating in a conspiracy to commit sex trafficking, in

2

violation of 18 U.S.C. § 1594. Count Two charged Tal Alexander with sex trafficking a victim by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 2. Count Three Charged the Defendants, plus Tal Alexander, with sex trafficking another victim by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 2.[1]

The Defendants were arrested on December 11, 2024 by state authorities in the Miami, Florida area on charges of felony sexual battery. The Defendants

---

[1] On May 8, 2025, a grand jury returned a second superseding indictment, S2 24 Cr. 676, which charged nine counts. Dkt. 63. Counts One through Three charged the same offenses as the Indictment. Count Four charged the Defendants and Tal Alexander with inducing a victim to travel to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2. Count Five charged Alon Alexander and Tal Alexander with sex trafficking a minor victim by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 2. Count Six charged the Defendants and Tal Alexander with sex trafficking a victim by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 2. Count Seven charged the Defendants and Tal Alexander with sex trafficking a victim by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 2. Count Eight charged Tal Alexander with sex trafficking a victim by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591 and 2. Count Nine charged Tal Alexander with inducing a victim to travel to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2.

3

were arraigned on the state charges and were subsequently transferred to federal custody in the Southern District of Florida where they made initial appearances there under Federal Rule of Criminal Procedure 5(c)(3). On January 3, 2025, following a multi-day detention hearing, Magistrate Judge Eduardo Sanchez of the Southern District of Florida ordered Alon Alexander detained and removed to the Southern District of New York. On January 8, 2025, Oren Alexander waived a detention hearing in Florida and consented to removal to the Southern District of New York.

Alon Alexander and Tal Alexander appealed their detention orders from Florida to Judge Caproni, and Oren Alexander made his initial bail application to Judge Caproni. On January 15, 2025, Judge Caproni held a consolidated detention hearing for the Defendants and Tal Alexander. At the hearing, Judge Caproni found "there was no condition or combination of conditions that would reasonably assure the safety of the community and the appearance of the Defendants at trial," and ordered the detention of all three defendants. The Defendants filed notices of appeal of the District Court's bail decision.

Trial is scheduled to begin on January 5, 2026.

## Statement of Facts

### A. The Offense Conduct and Evidence

The Indictment charges the Defendants and their brother Tal Alexander with conspiring to commit sex trafficking by force, fraud, and coercion, beginning in at least 2010 and continuing through at least 2021,

4

and with committing specific acts of sex trafficking by force, fraud, and coercion. As part of this scheme, the Defendants repeatedly and violently sexually assaulted and raped dozens of victims, most of whom had been drugged. Many of these assaults involved multiple brothers assaulting the same victim. (A. 1-5; 473-477).[2]

The Defendants' sex trafficking conduct followed a consistent pattern, or playbook. The Defendants provided their victims with material benefits, including travel and lodging accommodations, among other inducements, that were used to lure the victims to luxury vacation destinations, including frequently, the Hamptons. (A. 1-5; 473). After getting their victims to these locations, the Defendants isolated their victims and forcibly raped and sexually assaulted their victims, usually after drugging the victims and rendering them unable to resist or escape. (A. 1; 474).

The Defendant's pattern of sexual violence was not limited to these pre-planned encounters, and the Defendants also raped and sexually assaulted women they met in chance meetings, such as on dating applications or at clubs. (A. 1-5; 473). These sexual assaults

---

[2] "Br." refers to the Defendants' brief on appeal; "A." refers to the Appendix filed by Tal Alexander that accompanied Tal Alexander's motion for pre-trial release; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

5

also involved the Defendants drugging their victims and preventing the victims from resisting or escaping (A. 474). This pattern of sexual violence predated the charged conspiracy period and extended back to before the Defendants graduated from high school. (A. 10; 471-72).

All told, as of January 2025, at the time of the detention hearing in the District Court, more than 40 victims had reported to the FBI that they had been sexually assaulted by one of the Defendants or their brother Tal Alexander. (A. 77; 471-72). The victims described rapes that spanned years and were committed in many different locations but which were consistent in their details. (A. 80; 472). Thirteen victims described being raped or sexually assaulted by Alon Alexander, including twelve during the time of the charged conspiracy, two of whom were minors at the time of the assaults. (A. 475). Twenty victims described being raped or sexually assaulted by Oren Alexander, including seventeen during the time of the charged conspiracy, one of whom was a minor at the time of the assault. (A. 475-76).

The Defendants and their co-conspirators used electronic communications to plan and coordinate their assaults and arrange the necessary logistics. This included text messages among the Defendants and their brother Tal Alexander, where they agreed to transport victims to the Hamptons (A. 12); text messages among the Defendants and others where they arranged for drugs to be provided to victims (A. 14); and an email between Tal Alexander and Alon Alexander in which Tal Alexander described one victim they

6

had arranged to host in the Hamptons for the weekend as a "cheap hooker" (A. 480).

The Defendants also video recorded some of the assaults, including a video from the spring of 2009 that shows one of the Defendants having sex with an incapacitated woman (A. 77; 418-19), and videos from 2013 that show the Defendants engaging in sexual conduct with a victim when the victim was in a blacked-out state of intoxication (A. 473).

## B. The Florida Bail Proceedings

Following his transfer to federal custody on December 20, 2024, Alon Alexander had a two-day detention hearing before Magistrate Judge Eduard I. Sanchez in the Southern District of Florida on December 30, 2024 and January 3, 2025. (A. 235-390). During the hearing, the Government proffered the offense conduct and evidence, the defendant called multiple character witnesses, including his mother, wife, uncle, and former girlfriend, and the parties presented oral arguments. Alon Alexander presented as part of his proposed bail package to Judge Sanchez a plan for private detention and called a security executive as a witness. (A. 311-15).

At the conclusion of the first day of the hearing, Judge Sanchez described that the proposed bail conditions, including private security, were inadequate to address the risk of flight in the case, and he offered Alon Alexander the opportunity to strengthen his proposed bail package. (A. 353-54). Judge Sanchez described that "the weight of the evidence . . . is very strong and certainly [is] strong in the nature of

7

creating an incentive for someone to consider fleeing." (A. 354). Judge Sanchez noted that the incentive to flee in the face of a strong case was especially potent "with the mandatory sentence as being faced here and the potential life in prison." (A. 354-55). Alon Alexander supplemented his bail proposal before the hearing resumed and requested to be released to private security in a private residence in the Miami area, or alternatively in New York. (A. 364-65; 371).

After hearing additional argument, Judge Sanchez ordered Alon Alexander detained pending trial. Judge Sanchez found that no conditions—including the proposed private detention condition—could reasonably assure Alon Alexander's appearance in court. In his oral decision, Judge Sanchez emphasized the "extremely serious charges that carry extremely serious penalties" including a "15-year minimum mandatory . . . [and] the potential for a life sentence"; the "strong" evidence in the case, including "dozens of victims who have come forward . . . . under similar circumstances and made similar allegations," and the defendant's foreign connections. (A. 383-84). Judge Sanchez ultimately found "there are too many incentives" for Alon Alexander to flee, beyond his wealth, for any combination of bail conditions to reasonably assure his appearance in court. (A. 385).

Judge Sanchez followed his oral decision with a written order. (A. 25-28). In his written order of detention, Judge Sanchez noted that, notwithstanding concerns about the propriety of a bail system that would allow rich defendants to hire private security but would require jailing poor defendants, he had

8

considered the private detention proposal. Even with that condition, Judge Sanchez found that Alon Alexander would remain "a serious flight risk and that no combination of conditions can reasonably assure his appearance at trial." (A. 27). In making this finding, Judge Sanchez wrote:

> In finding that pre-trial detention is appropriate in this case, the Court has considered the substantial weight of the evidence and the significant sentence that ALEXANDER faces. The Court notes that the weight of the evidence is quite strong, including the accounts of many victims spanning approximately two decades who come from different places and different social circles and who have provided similar accounts of their encounters with ALEXANDER and his codefendants. Moreover, ALEXANDER is facing a significant amount of prison time and is facing his first federal offense/conviction. If convicted, ALEXANDER faces a fifteen-year mandatory minimum sentence and a potential life sentence with a sentencing guidelines range of life in prison. When considering the nature and circumstances of the offense, the weight of the evidence, including the number of accusers, the extensive financial resources available to ALEXANDER, his personal and familial ties to foreign countries, including Israel and Brazil, the

9

> Court agrees with the government that
> the Defendant is a serious flight risk.

(A. 28).

Following Alon Alexander's detention order in Florida, which itself was preceded by another Florida magistrate judge's detention order for Tal Alexander (*see* A. 21-24), Oren Alexander waived a detention hearing in Florida and chose to make his initial bail application to Judge Caproni in the Southern District of New York. (Dkt. 22 at 64-65).

## C. The District Court Bail Hearing

Following the proceedings in Florida, the parties requested that Judge Caproni hold a consolidated hearing to address pre-trial detention for the Defendants and Tal Alexander. The consolidated hearing was held on January 15, 2025. The Defendants, who were still in transit from Florida, waived their appearances at the hearing.

In advance of the hearing, all parties submitted written arguments. (A. 29-40; 88-94 (Tal Alexander); A. 41-61 (Alon Alexander); A. 62-75; 95-103 (Oren Alexander); A. 76-87 (Government)). The Defendants proposed to Judge Caproni a bail package with a bond "in any dollar amount," surrender of passports, home confinement, and "armed security guards stationed at the location of home confinement at all times," as its principal conditions. (A. 44; *see also* A.31-32).

At the hearing, Judge Caproni heard lengthy argument from all parties. (A. 402-515). The Defendants argued against the strength of the Government's case

10

and also that the alleged rapes and sexual assaults were several years in the past, and emphasized their ties to the United States and the purported strength of their proposed bail package. During questioning by Judge Caproni, Alon Alexander's attorney agreed that the proposed bond "in any dollar amount" would be secured only "to the extent of their real property and . . . liquidated assets." (A. 455).

The Government's arguments emphasized the breadth and scale of the violent rapes and sexual assaults committed by the Defendants and Tal Alexander, the corroborating victim accounts, supporting witness accounts, electronic communications between the conspirators and communications with their victims, video evidence of the Defendants having sex with incapacitated women, the mandatory minimum and potential maximum sentences, foreign ties, and incentives to flee before trial. (A. 471-91).

With respect to the Defendants' proposal to have private armed security as a condition of bail, Judge Caproni asked all defense counsel if anyone disagreed that *United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019), which in most circumstances forbids the condition, was "the controlling precedent in the Second Circuit relative to private jails." (A. 407). Neither of the Defendants or Tal Alexander objected or raised any statutory or constitutional challenges to *Boustani*.

At the conclusion of the hearing, Judge Caproni ordered the detention of the Defendants and Tal Alexander based both on the danger to the community and risk of flight that would be created by releasing the Defendants, even on bail conditions. (A. 516-20). In

11

her decision, Judge Caproni made numerous findings related to the case, the nature of the offense, the strength of the evidence, the possible penalties, the history and characteristics of the Defendants, the Defendant's foreign ties, and their motivations to flee the jurisdiction. (A. 517-20).

At the outset of the decision, Judge Caproni quoted from this Court's controlling precedent in *Boustani* that "the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial, while wealthy defendants are released to self-funded private jails," and that any contrary rule "would foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy." (A. 516-517 (quoting *Boustani*, 932 F.3d at 82). Applying *Boustani*, Judge Caproni found, that the Defendants' proposed private security condition could not be considered.

In describing the danger posed to the community that would exist if the Defendants were released, Judge Caproni found that "the nature and circumstances of that offense" namely that "over many years, they have sexually assaulted women" weighed in favor of a finding of dangerousness. (A. 517).

Judge Caproni also found that "[t]he weight of the evidence is strong." (A. 517). In reaching this conclusion, Judge Caproni noted the accounts of more than 40 women of being raped and sexually assaulted by the Defendants and Tal Alexander, including "a consistency in the details about how they are lured into an area under the defendant's control and then drugged and assaulted," which corroborated the

12

victims' accounts. (A. 517). She also cited the video evidence of sex "with a victim who is obviously and visually incapacitated." (A. 518).

When considering the Defendants' history and characteristics, Judge Caproni found that "the government's evidence is persuasive that this sort of joint, fraternal sexual misconduct has continued for years. This was not a one-time party where things went wrong." (A. 518). And she rejected the defense argument that any danger once presented by the Defendants had abated since they had gotten married, noting that the violent assaults spanned years and had been regular and persistent. (A. 518).

In addition to presenting a danger to the community, particularly "a danger to unsuspecting women to be drugged and raped," Judge Caproni also found that the Defendants are a flight risk. (A. 519-20). In making this finding, Judge Caproni focused on the Defendants' foreign connections, including access to real estate in foreign countries through their parents, foreign citizen spouses and in-laws, and other family members abroad. (A. 519).

Judge Caproni also noted that the Defendants face "very substantial jail time if convicted" including a mandatory minimum sentence of 15 years. (A. 519). And she found that the reputational harm they would suffer at trial and the impact a trial would have on their families further created "a substantial reason" to flee, and that even if eventually extradited from a foreign country after fleeing, this nevertheless would benefit the Defendants by delaying the case for potentially years. (A. 519-20).

13

Judge Caproni ended her oral decision by saying:

> In short, these three defendants both pose a substantial risk to the safety of the community and a flight risk, and there is no condition or combination of conditions that are consistent with the Bail Reform Act that would reasonably ensure the safety of the community and the appearance of the defendants at trial.

(A. 520).

## A R G U M E N T

### POINT I

### The Defendants' Arguments About Private Security Are Foreclosed by *Boustani*'s Holding that the Bail Reform Act Does Not Permit Self-funded Private Jails Except in Circumstances Not Present Here

#### A.   Applicable Law

The Bail Reform Act permits courts to release defendants pending trial subject to the conditions necessary to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The statute also describes thirteen potential release conditions that a court may impose to ensure a defendant does not flee or endanger the community. A fourteenth condition permits a court to impose "any other condition that is reasonably necessary to assure the appearance

14

of the person as required and to assure the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(xiv).

In *United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019), this Court addressed the issue of whether and under what circumstances the law permits wealthy defendants who are pending trial to use their resources to hire private guards and be subject to private detention, rather than be spend time in pre-trial detention in the custody of the United States Marshals Service. The Court held that "the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *Boustani*, 932 F.3d at 82. The Court found that a private detention bail condition is authorized under the statute in only one circumstance, "where the defendant is deemed to be a flight risk primarily *because* of his wealth . . . [and] where, *but for* his wealth, he would not have been detained." *Id.* (emphasis in original). This rule requires courts to reject defendants' private detention bail proposals unless *Boustani*'s narrow exception is satisfied.

## B. Discussion

The Defendants have identified a single "issue presented" in their appeal: whether it was an error for Judge Caproni to find that their proposed private detention bail condition violated the Bail Reform Act and therefore not to consider the proposed condition before ordering their pre-trial detention. (*See* Br. 4). That is plainly a challenge to this Court's holding in *Boustani*,

15

but the Defendants did not raise their challenges to *Boustani* below and their claim is reviewed for plain error. They cannot satisfy that standard because Judge Caproni faithfully applied this Court's binding precedent, and their challenges to *Boustani* are meritless in any event.

### 1. There Was No Plain Error in Judge Caproni's Decision to Follow This Court's Binding Precedent

The bulk of the Defendants' arguments contend that this Court was wrong to hold that the Bail Reform Act forbids "a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *Boustani*, 932 F.3d at 82; (see Br. 35-59). Rather, the Defendants urge, both the Bail Reform Act and the Eighth Amendment expressly require the two-tiered justice system this Court rejected in *Boustani*. (Br. 46-59).

As an initial matter, the Defendants did not argue in the District Court that *Boustani* was wrong or that the Constitution required preferential treatment for wealthy defendants willing to pay for their own private jails. (*See* A. 407). Instead, the Defendants argued in the District Court that they fall within *Boustani*'s narrow exception that permits private detention on bail. (*See* A. 52; 89-90; 443). Therefore, on appeal the argument is reviewable only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Mendonca,* 88 F.4th 144, 152 (2d Cir. 2023) ("[B]efore we may correct an error forfeited by a party's failure to object below, there

16

must be (1) error, (2) that is plain, and (3) that affects substantial rights; then, once those initial conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."). The Defendants obviously fail to meet this high bar. There was no error, let alone plain error, in Judge Caproni's reliance on binding precedent from this Court during the bail hearing. *Cf. United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) (no plain error even when the "operative legal question is unsettled, including where there is no binding precedent from the Supreme Court of this Court.").

Moreover, this Court has already considered and decided the question of whether and under what circumstances private security paid for by a defendant may be used in lieu of pre-trial detention. The answer, the Court found, is that the condition is permissible only "where the defendant is deemed to be a flight risk primarily *because of* his wealth . . . [and] where, *but for* his wealth, he would not have been detained." *Boustani*, 932 F.3d at 82 (emphasis in original). This decision remains controlling on appeal, just as it was in the District Court. *See, e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court."). Accordingly, the Defendants' challenges to *Boustani* are foreclosed by binding precedent.

17

### 2. The Defendants' Arguments that *Boustani* Was Wrongly Decided Are Meritless

Because the Defendants did not raise below the argument that *Boustani* was wrongly decided, and because *Boustani* is binding precedent, this Court can and should decline to address that argument. But in any event, the Defendants' arguments on this front are unpersuasive.

The Defendants first argue that because the Bail Reform Act explicitly permits designation of third-party custodians as a bail condition, this implicitly requires courts to authorize defendants to be released to paid, armed guards in a private jail. (Br. 40-46). But the Bail Reform Act's reference to a "designated person, who agrees to assume supervision and to report any violation of a release condition to the court," and who "is able reasonably to assure" the court that the defendant is not a danger or flight risk, is not an invitation to deputize private parties to exercise the coercive use of force over the defendant. *See* 18 U.S.C. § 3142(c)(1)(B)(i). Rather, as multiple courts have recognized, such a "designated person" is typically a family member or friend who is in a position to regularly observe and interact with the defendant and report to the district court, and who can exercise moral suasion over the defendant by virtue of their existing relationship. *See, e.g.*, *United States v. McDuffie*, 451 F. Supp. 3d 281, 287 (S.D.N.Y 2020) (defendant's brother); *United States v. Stephens*, 447 F. Supp. 3d 63, 67-68 (S.D.N.Y. 2020) (defendant's mother).

Conversely, the Defendants have proposed "[a]rmed security guards stationed at the location of

18

home confinement at all times (24 hours per day, every day) to ensure compliance with the conditions imposed by the Court." (A. 44). This private jail would further include "video cameras and door and window sensors," phone and computer monitoring, the "use of force" as deemed appropriate by the guards, and accompaniment on any court-approved travel. (A. 44). In other words, the Defendants' own bail proposal indicates that the only way to ensure their appearance in court and protect the community is to authorize armed guards to monitor them at all times and be prepared to employ force against them. That is far afield from the moral-suasion function of a third-party custodian who undertakes to report violations to the district court as set forth in the Bail Reform Act. If pre-trial supervision that relies on armed guards and the threat of force is required as a bail condition, then the facts "demand a defendant's detention." *United States v. Sabhnani*, 493 F.3d 63, 74 n.13 (2d Cir. 2007); *see also United States v. Banki*, 369 F. App'x 152, 154 (2d Cir. 2010) (a defendant's proposal for privately funded armed security "might be best seen not as specific conditions of release, but simply as a less onerous form of detention available only to the wealthy"); *United States v. Dermen*, 779 Fed. App'x 497 (10th Cir. 2019) ("[I]f his risk of flight can be constrained only by constant supervision by private security personnel that are willing to use physical force, the appropriate means to accomplish that is pretrial detention.").

The Defendants' second argument against *Boustani*'s interpretation of the Bail Reform Act is that other features of the Act, and the criminal justice system more broadly, potentially advantage wealthier

19

defendants. (Br. 46-54). They argue, for instance, that wealthy defendants may find it easier to post bail or to find treatment programs that support pre-trial release. And they argue that wealthy defendants can often afford more expensive counsel and mobilize more resources in their defense.

But the conclusion the Defendants draw from those arguments is perverse. They posit that, because they have identified potential inequities favoring wealthy defendants, the solution is to double down on these disparities. The existence of some inequalities, the Defendants argue, means that courts not only may but must deliberately exacerbate those inequalities by permitting wealthy defendants to hire their own prison guards to watch them at home, in circumstances where similarly situated poorer defendants would be held at federal detention centers. What the Defendants propose in response to structural inequities—a "less onerous form of detention available only to the wealthy," *Boustani*, 932 F. 3d at 82—is akin to fighting a fire with kerosene, rather than with water.

The Defendants cite *United States v. Weigand*, where the district court found that private security was a permissible bail condition for a wealthy defendant who had been "deemed to be a flight risk primarily *because* of his wealth." *See United States v. Weigand*, 492 F. Supp. 3d 317, 319 (S.D.N.Y. 2020) (quoting *Boustaini*, 932 F.3d at 82); (Br. 54). But the district court in *Weigand* was simply applying *Boustani*, not seeking to circumvent or overrule this Court's precedent. In recognizing that *Boustani* allowed private security in the narrow circumstance where a defendant

20

would not have been detained but for his wealth, and in finding that the facts of the case fit that narrow exception, the result in *Weigand* was an effort to ensure that all "defendants are . . . treated similarly, without regard to wealth," not an opening that would permit special treatment for only the richest defendants. *Weigand*, 492 F. Supp. 3d at 319.[3]

Finally, the Defendants argue that the Eight Amendment requires that rich defendants, even ones who present a clear danger to the community, must be allowed to pay for private detention rather than be detained in a federal jail. (Br. 55-59). The Constitution requires no such special treatment for the wealthy, however. The Defendants point out that courts take the financial circumstances of defendants into account when setting monetary bonds, but that is irrelevant to whether courts must permit defendants to pay for their own security. (*See* Br. 55-56). The purpose of monetary bonds is to create a financial incentive for defendants to appear in court and abide by their release conditions, and to be effective, the incentive must be tailored to the defendant's financial circumstances.

---

[3] *Weigand* involved a defendant who was charged with conspiring to commit bank fraud, where there was "no allegation that [the defendant] is a danger to the community," and where the conditions caused by the COVID-19 pandemic necessitated release. *See Weigand*, 492 F. Supp. 3d at 318-320; *see also United States v. Akhavan*, 523 F. Supp. 443, 446 (S.D.N.Y. 2021). Those facts are far afield from the situation present here.

21

The threat of forfeiting a $25,000 bond, for example, would have obviously different impacts on wealthy and poor defendants. That is irrelevant to the argument that the Constitution requires the availability of private detention as a release condition for those who can afford it.

The Defendants also err in arguing that the Supreme Court's decision in *United States v. Salerno*, 481 U.S. 739 (1987), which upheld the constitutionality of the Bail Reform Act, somehow undermines *Boustani*. (Br. 57-58). In *Salerno*, the Supreme Court upheld the Bail Reform Act's provisions that allowed courts to consider the danger a defendant presented to the community in making bail determinations, and not only a defendant's risk of flight, as had previously been the law. *Salerno*, 481 U.S. at 755. In so holding, the Supreme Court noted that the Eight Amendment's requirement that "excessive bail shall not be required" "says nothing about whether bail shall be available at all." *Id.* at 752. To the extent that the Eighth Amendment provided any substantive limitation on Congress's ability to cabin the availability of bail, it was that "the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil." *Id.* at 754. *Salerno* provides no support to the Defendants here. Nothing in *Salerno* suggests that courts are required to consider any bail condition that a defendant may propose or accept any collateral a defendant may offer. And there is nothing in the text of the Eighth Amendment or in the holding in *Salerno* that would require release whenever a defendant can afford to finance a private jail for himself. *Salerno*, 481 U.S.

at 754 ("Indeed, the very language of the Amendment fails to say all arrests must be bailable.").

The Defendants are also wrong that *Boustani*'s limitation on the use of private jails fails to serve an important government interest. (Br. 57-58). There is a compelling governmental interest in ensuring equal and fair treatment for all criminal defendants that "sounds in equal protection." *Weigand*, 492 F. Supp. 3d at 319. Permitting wealthy defendants to literally buy their way out of jail would be profoundly contrary to the "fundamental principle of fairness that the law protects the interests of rich and poor criminals in equal scale," and would "foster inequity and unequal treatment." *Boustani*, 932 F.3d at 82. The rule the Defendants urge would seed distrust in the criminal justice system, delegitimize the role of courts in protecting all citizens, and further notions that the law is a tool designed to benefit the wealthy and privileged at the expense of the poor. Ensuring equal and fair treatment of all persons brought to court serves the highest governmental interests.

## POINT II

### Judge Caproni Did Not Clearly Err in Denying the Defendants Bail

### A. Applicable Law

If a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the

23

person before trial." 18 U.S.C. § 3142(e). In seeking pre-trial detention, the Government bears the burden of showing, by a preponderance of the evidence, that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can sufficiently address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Khusanov*, 731 Fed. App'x 19, 21 (2d Cir. 2018); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).

For certain charges, including sex trafficking by force, fraud or coercion as charged in this case, there is a statutory presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(D). In such a case, the defendant "bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). Even where a defendant produces sufficient evidence to rebut the statutory presumption of detention, the presumption does not disappear; instead, it becomes a factor to be weighed and considered like all the others in deciding whether to release the defendant. *See United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).

In determining bail, the court must consider several factors, including: (1) "the nature and circumstances of the offense charged, including whether the offense is … a violation of section 1591"; (2) "the

24

weight of the evidence against the person"; (3) the "history and characteristics of the person," including the person's criminal history; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

This Court applies "deferential review to a district court's order of detention." *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019). This Court "review[s] a district court's findings as to the accused's risk of flight and potential danger to the community for clear error." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011). On appeal, this Court will reverse only if "on the entire evidence," it is "left with the definite and firm conviction that a mistake has been committed." *Boustani*, 932 F.3d at 81; *see also United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000).

## B. Discussion

After receiving written submissions from all parties and presiding over a lengthy hearing, Judge Caproni found that the "defendants both pose a substantial risk to the safety of the community and a flight risk, and there is no condition or combination of conditions that are consistent with the Bail Reform Act that would reasonably ensure the safety of the community and the appearance of the defendants at trial." (A. 520). Judge Caproni committed no error, much less a clear error, in making these factual findings.

25

### 1. Judge Caproni Did Not Clearly Err in Finding the Defendants Are Dangers to the Community

Judge Caproni found that "the government has shown, by clear and convincing evidence, that these defendants pose a risk to the community." (A. 517). This finding was supported by the nature and circumstances of the offenses, the strength of the evidence, and the Defendants' history and characteristics. (A. 517-518).

In appealing their detention and arguing that Judge Caproni clearly erred in her factual findings, the Defendants make two arguments about danger: first, that Judge Caproni improperly relied on their decade-plus pattern of violent sexual assault in making a dangerousness finding, and second, that the evidence in the case is not as strong as Judge Caproni found it to be. Neither argument has merit and neither rises to the level of clear error.

Faced with a prolonged pattern of violent sexual assaults that targeted scores of victims, Judge Caproni rightly considered that history in her assessment of the Defendants' continued danger. The Defendants argue now that whatever danger they may have once posed they are no longer dangerous because the last reported rapes were in 2021 or earlier. But the pattern of sex trafficking and violence is so extensive that reliance on that past conduct to predict future behavior is entirely reasonable. *See United States v. Epstein*, 425 F. Supp. 3d 306, 314-20 (S.D.N.Y. 2019) (defendant who trafficked dozens of minor victims detained on

26

danger and flight grounds 14 years after the end of the charged conduct).

The defendants cite *United States v. Fox*, No. 22-1043, 2022 WL 2564600 (2d Cir. July 8, 2022) (summary order) in support of their argument that courts "have declined to detain defendants as a danger to the community where there was a passage of time with no allegations of recent wrongdoing by the defendant." (Br. 78). Their reliance on *Fox* is misplaced. In *Fox*, this Court upheld a district court's decision granting bail to a defendant charged with sex trafficking and other offenses, because, while it recognized that the case was a "close call," it could not "conclude that the district court clearly erred." 2022 WL 2564600 at *2. Essentially, this Court deferred to the district court's determination that, on the facts of that case, the Government had not met its burden to show that the defendant posed a danger to the community. *Id.* Indeed, to be consistent with *Fox*, this Court should defer to the District Court's reasoned analysis below and uphold its determination regarding detention. And the evidentiary record in *Fox* did not include anything like the extensive direct testimony and corroborating evidence of sexual violence that was before Judge Caproni in this case. *Id.* at *2-3.

The defendants also attack the strength of the evidence. They argue that the victim accounts of rape and sexual assault proffered by the Government should not be credited. (Br. 83-87). However, the grand jury found otherwise, and Judge Caproni properly credited the allegations in the Indictment and the Government's detailed evidentiary proffers. *See LaFontaine*, 210 F.3d

27

at 131 (proffers are "permissible both in the bail determination and bail revocation contexts"). Those proffers included citing to the accounts of at least thirteen victims who described being raped or sexually assaulted by Alon Alexander, including two who were minors, and twenty victims who described being raped or sexually assaulted by Oren Alexander, including, one who was a minor at the time of the assault. (A. 475-476).

In attacking the victims' credibility, the Defendants simply ignore the corroborative power of dozens of victim accounts of similar conduct by the defendants, especially when many of these victim accounts were also supported by communications, photos, videos, and outcry witnesses.[4] Instead, the Defendants focus, as they did at the detention hearing, on contesting the accounts of three victims—who are not the victims listed in the substantive counts of the Indictment—to suggest that the sexual contact that the Defendants had with these victims was consensual. (Br. 85-86; A. 420-24, A. 531). However, as Judge Caproni observed, "the Government's proffer is that more than 40 women have made such allegations against these defendants, and there is a consistency in the details about how they are lured into an area under the defendant's control and then drugged and assaulted; [which] tends to corroborate their stories that these victims are not fabricating what happened to them."

---

[4]  An outcry witness is a friend or family member of a sexual assault victim who was told about the assaults shortly after they occurred. *See Carroll v. Trump*, 124 F.4th 140, 153 (2d Cir. 2024).

28

(A. 517-18). In short, Defendants' scattershot attacks on the credibility of a small number of the individual victims neither impugns the overall strength of the Government's case nor undercuts Judge Caproni's findings. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

The Defendants also argue that Judge Caproni put insufficient stock in their submitted polygraph examination results. (Br. 87). But she did not clearly err by placing little weight on a polygraph examination administered by someone the Defendants hired themselves. The Defendants cite a single case where a defendant submitted a polygraph in which he denied the charges as part of an argument for bail. *See United States v. Fox*, 602 F. Supp. 3d 434, 441 (W.D.N.Y. 2022). In *Fox*, the District Court noted the polygraph result but did not place any particular weight on it. And the subsequent proceedings in *Fox* actually illustrate the unreliability of polygraphs, because despite a polygraph in which he denied any non-consensual sex, the defendant later pleaded guilty to sex trafficking by force, fraud, or coercion and was sentenced to 360 months' imprisonment. *See United States v. Fox*, No. 22 Cr. 53 (JLS), Dkt. 249 (W.D.N.Y. Sept. 23, 2024) (Judgment of Conviction).

The Defendants also take issue with the legal theory by which they are charged with sex trafficking, arguing that the Indictment fails to allege that there was a "commercial sex act." (Br. 88-89). Those arguments are unsupported by any legal authority reading the

29

statute in the narrow way the Defendants apparently propose, and are contrary to the statutory text. The statute defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3); *see United States v. Raniere*, 55 F.4th 354, 360 (2d Cir. 2022). The "anything of value need not have a monetary or financial component," *Raniere*, 55 F.4th at 362, and "the thing of value can be given to or received by any person, including the victim," *Ardolf v. Weber*, 332 F.R.D. 467, 478 (S.D.N.Y. 2019). The statute requires "a causal connection between the sexual act and the giving or receiving of anything of value." *Raniere*, 55 F.4th at 365. These are not high bars, and the Court has described that the statute is to be read as expansively as supported by the text. *See id.* at 361. ("[W]e observe that Congress's definition of 'commercial sex act'—'*any* sex act, on account of which *anything* of value is given to or received by *any* person,'—uses the word or prefix 'any' three times. Congress's repeated use of the word 'any' in its definition of 'commercial sex act' further supports an expansive understanding of the specific phrase at issue … .").

Here, the Indictment alleges that the Defendants and their co-conspirators gave their victims material benefits, including travel and lodging, to lure the victims to locations where the Defendants could sexually assault the victims. The Defendants' suggestions that the Indictment merely charges that they threw "appealing parties" is simply incorrect. (Br. 89). As set forth in the Indictment, the Defendants and co-conspirators "induced" victims to come to locations where they were coerced into sex acts by, among other things,

30

"offering to purchase their flights, making other travel arrangements, and/or providing accommodations without charge," and the Defendants and co-conspirators "pooled financial resources in order to pay for flights and other travel expenses" for victims. (A. 4). The causal connection between the sexual act and the giving of a thing of value is straightforward: because the victims accepted these benefits from the Defendants, the Defendants could and did forcibly assault the victims. Especially "at the indictment stage" of this case, where courts "do not evaluate the adequacy of the facts to satisfy the elements of the charged offense," *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021), the Defendants have failed to put forth any legal challenge to the Indictment that would call into question the strength of the evidence.

## 2. Judge Caproni Did Not Clearly Err in Finding the Defendants are Flight Risks

The Government identified in its written arguments and during the detention hearing numerous factors that contributed to the Defendants' risk of flight: (1) the potential sentences in the case of at least fifteen years and up to life imprisonment, coupled with strong evidence of the Defendants' guilt, (2) the deceptive nature of the offenses, (3) the Defendants' extensive foreign ties, (4) the significant reputational harm the Defendants will suffer during trial, and (5) the access to resources needed to quickly and efficiently flee the jurisdiction. (A. 81-82, 487-91). Judge Caproni cited many of these reasons in her oral decision, particularly the Defendants' foreign ties, lengthy potential prison

31

sentences, and substantial incentives to avoid a painful trial for themselves and their families. (A. 519-20).

In appealing their detention and arguing that Judge Caproni erred in her factual findings, the Defendants ignore entirely many of the justifications that Judge Caproni cited when ordering their detention. They do not even bother to address Judge Caproni's findings that the penalties they face after conviction or the substantial reputational harm they face during and after trial create enormous incentives to flee. They make no effort to show that assessed as a whole, Judge Caproni's findings about the risk of flight were clearly erroneous. Instead, they focus on wealth-related arguments (on which Judge Caproni did not rely) and argue that Judge Caproni placed undue weight on their foreign ties. In doing so the Defendants simply reprise arguments that Judge Caproni considered but found wanting.

The Defendants' argument that Judge Caproni did not properly balance the Defendants' foreign ties and their ties to the United States simply fails to meet their heavy burden to show an abuse of discretion by the District Court. (Br. 63-65). Judge Caproni assessed the evidence that was presented, weighed it, and reached her conclusion about its relative merits. Considering the Defendants' foreign connections, history of travel, and the properties their family owned in multiple foreign countries, it was more than reasonable, and certainly not clearly erroneous, for Judge Caproni to find these connections supported the conclusion that the Defendants are flight risks. That the Defendants

32

disagree with her assessment does not warrant them relief on appeal.

The Defendants further argue that while they may have the "opportunity" to flee they have no "inclination" to flee. (Br. 66). But Judge Caproni was under no obligation to accept the Defendants' self-serving characterization of their "inclinations," and she reasonably found upon consideration of the full record that the penalties the Defendants face and the reputational harm they are likely to suffer "give them a substantial reason to leave the country." (A. 519-20). The Defendants' arguments fail to identify any clear error in that conclusion.

### 3. Judge Caproni Did Not Clearly Err in Finding the Defendants' Private Jail Proposal Violated the Bail Reform Act

The Bail Reform Act permits the use of private guards to avoid pre-trial detention *only* where the defendant is detained on risk of flight premised on his wealth. "[A] defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained." *Boustani*, 932 F.3d 82 (emphasis in original). This, however, is the exception to the rule and does not mean that in any circumstance where wealth contributes to a defendant's risk of flight that the defendant may pay for his own jailers, rather than be remanded. When wealth is just one of many factors, the condition is still forbidden. *See id.* ("It is clear that the District Court did not rely primarily on Boustani's personal wealth in finding that he posed a flight risk.

33

Rather, his wealth was one of many factors the Court considered.").

Where, as here, there are factors that require detention beyond a defendant's wealth—including other factors going to risk of flight—the use of private security guards is not permitted under the Bail Reform Act. *See id.* ("[I]f a similarly situated defendant of lesser means would be detained, a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention."); *see also United States v. Maxwell*, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) (Nathan, J.) ("the Defendant's argument that private security guards could ensure her appearance at future proceedings runs afoul of the Bail Reform Act" because the defendant "would be detained regardless of her wealth"). Circumstances beyond a defendant's wealth that justify pre-trial detention include, "the seriousness of the charged offenses and the lengthy possible sentence [a defendant] would face if convicted"; the strength and nature of the evidence against the defendant; and a defendant's "personal characteristics, including . . . 'frequent international travel . . . and extensive ties to foreign countries without extradition.'" *Boustani*, 932 F.3d at 83; *see also* 18 U.S.C. § 3142(g).

This case is far removed from one where the need for detention is based exclusively or even primarily on the Defendants' wealth, and Judge Caproni rightly rejected the Defendants' private detention proposal.

As described more above, Judge Caproni correctly found that the Defendants are clear dangers to the community and flight risks, regardless of their and

34

their family's wealth. As to the danger the Defendants present, Judge Caproni based her finding on the nature and circumstances of the offense, the strength of the evidence supporting the charges, and the duration of the Defendants' sex trafficking scheme. (A. 517-18). As to the risk of flight, Judge Caproni provided a detailed rationale for finding a flight risk and did not even mention the Defendants' wealth as a factor. (A. 519-20). Instead, she cited the Defendants' foreign ties, a 15-year mandatory minimum sentence, the likelihood of "very substantial [prison] time," and incentives to flee to save themselves and their families from severe reputational harm. (A. 519-20). To the extent that the Defendants attempt to suggest that Judge Caproni somehow implicitly relied on the Defendants' wealth in her decision, such as in her reference to their parent's ownership of property overseas (A. 519), that was clearly not the only or even the primary basis for Judge Caproni's decision.

In sum, "[a] similarly situated defendant of lesser means surely would be detained pending trial, and [the Defendants are] not permitted to avoid such a result by relying on [their] own financial resources to pay for a private jail." *Boustani*, 932 F.3d at 83. Judge Caproni's finding to this effect was not clearly erroneous and should be affirmed.

35

## CONCLUSION

**The District Court's order should be affirmed.**

Dated:  New York, New York
        May 12, 2025

                    Respectfully submitted,

                    JAY CLAYTON,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

KAIYA ARROYO,
ELISABETH ESPINOSA,
ANDREW JONES,
NATHAN REHN,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 8,276 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*